# UNITED STATES *v.* OREGON STATE MEDICAL SOCIETY ET AL.

No. 19.   Argued January 4, 7, 1952.—Decided April 28, 1952.

*Stanley M. Silverberg* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, J. Roger Wollenberg* and *Daniel M. Friedman.*

*Nicholas Jaureguy* argued the cause for appellees. With him on the brief were *Clarence D. Phillips* and *John J. Coughlin.*

Mr. Justice Jackson delivered the opinion of the Court.

This is a direct appeal by the United States [1] from dismissal by the District Court [2] of its complaint seeking an injunction to prevent and restrain violations of §§ 1 and 2 of the Sherman Act. 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2.[3]

Appellees are the Oregon State Medical Society, eight county medical societies, Oregon Physicians' Service (an Oregon corporation engaged in the sale of prepaid medical care), and eight doctors who are or have been at some time responsible officers in those organizations.

This controversy centers about two forms of "contract practice" of medicine. In one, private corporations organized for profit sell what amounts to a policy of insurance by which small periodic payments purchase the right to certain hospital facilities and medical attention. In the other, railroad and large industrial employers of labor contract with one or more doctors to treat their ailing or injured employees. Both forms of "contract practice," for rendering the promised medical and surgical service, depend upon doctors or panels of doctors who cooperate on a fee basis or who associate themselves with the plan on a full- or part-time employment basis.

Objections of the organized medical profession to contract practice are both monetary and ethical. Such

---

[1] Pursuant to § 2 of the Expediting Act of 1903, 32 Stat. 823, as amended, 15 U. S. C. § 29.

[2] 95 F. Supp. 103.

[3] 26 Stat. 209, 15 U. S. C. § 1: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."

15 U. S. C. § 2: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor . . . ."

practice diverts patients from independent practitioners to contract doctors. It tends to standardize fees. The ethical objection has been that intervention by employer or insurance company makes a tripartite matter of the doctor-patient relation. Since the contract doctor owes his employment and looks for his pay to the employer or the insurance company rather than to the patient, he serves two masters with conflicting interests. In many cases companies assumed liability for medical or surgical service only if they approved the treatment in advance. There was evidence of instances where promptly needed treatment was delayed while obtaining company approval, and where a lay insurance official disapproved treatment advised by a doctor.

In 1936, five private associations were selling prepaid medical certificates in Oregon, and doctors of that State, alarmed at the extent to which private practice was being invaded and superseded by contract practice, commenced a crusade to stamp it out. A tooth-and-claw struggle ensued between the organized medical profession, on the one hand, and the organizations employing contract doctors on the other. The campaign was bitter on both sides. State and county medical societies adopted resolutions and policy statements condemning contract practice and physicians who engaged in it. They brought pressure on individual doctors to decline or abandon it. They threatened expulsion from medical societies, and one society did expel several doctors for refusal to terminate contract practices.

However, in 1941, seven years before this action was commenced, there was an abrupt about-face on the part of the organized medical profession in Oregon. It was apparently convinced that the public demanded and was entitled to purchase protection against unexpected costs of disease and accident, which are catastrophic to persons without reserves. The organized doctors completely re-

versed their strategy, and, instead of trying to discourage prepaid medical service, decided to render it on a nonprofit basis themselves.

In that year, Oregon Physicians' Service, one of the defendants in this action, was formed. It is a nonprofit Oregon corporation, furnishing prepaid medical, surgical, and hospital care on a contract basis. As charged in the complaint, "It is sponsored and approved by the Oregon State Medical Society and is controlled and operated by members of that society. It sponsors, approves, and cooperates with component county societies and organizations controlled by the latter which offer prepaid medical plans." 95 F. Supp., at 121. After seven years of successful operation, the Government brought this suit against the doctors, their professional organizations and their prepaid medical care company, asserting two basic charges: first, that they conspired to restrain and monopolize the business of providing prepaid medical care in the State of Oregon, and, second, that they conspired to restrain competition between doctor-sponsored prepaid medical plans within the State of Oregon in that Oregon Physicians' Service would not furnish prepaid medical care in an area serviced by a local society plan.

The District Judge, after a long trial, dismissed the complaint on the ground that the Government had proved none of its charges by a preponderance of evidence. The direct appeal procedure does not give us the benefit of review by a Court of Appeals of findings of fact.

The appeal brings to us no important questions of law or unsettled problems of statutory construction. It is much like *United States* v. *Yellow Cab Co.,* 338 U. S. 338. Its issues are solely ones of fact. The record is long, replete with conflicts in testimony, and includes quantities of documentary material taken from the appellees' files and letters written by doctors, employers, and employees. The Government and the appellees each put more than

two score of witnesses on the stand. At the close of the trial the judge stated that his work "does not permit the preparation of a formal opinion in so complex a case. I will state my conclusions on the main issues and then will append some notes made at various stages throughout the trial. These may be of aid to counsel in the preparation of Findings of Fact and Conclusions of Law to be submitted as a basis for final judgment." 95 F. Supp., at 104. These notes indicated his disposition of the issues, but the Government predicates a suggestion of bias on irrelevant soliloquies on socialized medicine, socialized law, and the like, which they contained. Admitting that these do not add strength or persuasiveness to his opinion, they do not becloud his clear disposition of the main issues of the case, in all of which he ruled against the Government. Counsel for the doctors submitted detailed findings in accordance therewith. The Government did not submit requests to find, but by letter raised objections to various proposals of the appellees.

The trial judge found that appellees did not conspire to restrain or attempt to monopolize prepaid medical care in Oregon in the period 1936–1941, and that, even if such conspiracy during that time was proved, it was abandoned in 1941 with the formation of Oregon Physicians' Service marking the entry of appellees into the prepaid medical care business. He ruled that what restraints were proved could be justified as reasonable to maintain proper standards of medical ethics. He found that supplying prepaid medical care within the State of Oregon by doctor-sponsored organizations does not constitute trade or commerce within the meaning of the Sherman Act, but he declined to rule on the question whether supplying prepaid medical care by the private associations is interstate commerce.

The Government asks us to overrule each of these findings as contrary to the evidence, and to find that the busi-

ness of providing prepaid medical care is interstate commerce. We are asked to review the facts and reverse and remand the case "for entry of a decree granting appropriate relief." We are asked in substance to try the case *de novo* on the record, make findings and determine the nature and form of relief. We have heretofore declined to give such scope to our review. *United States* v. *Yellow Cab Co., supra.*

While Congress has provided direct appeal to this Court, it also has provided that where an action is tried by a court without a jury "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52 (a), Fed. Rules Civ. Proc. There is no case more appropriate for adherence to this rule than one in which the complaining party creates a vast record of cumulative evidence as to long-past transactions, motives, and purposes, the effect of which depends largely on credibility of witnesses.

The trial court rejected a grouping by the Government of its evidentiary facts into four periods, 1930–1936, the year 1936, 1936–1941, and 1941 to trial. That proposal projected the inquiry over an eighteen-year period before the action was instituted. The court accepted only the period since the organization of Oregon Physicians' Service as significant and rejected the earlier years as "ancient history" of a time "when the Doctors were trying to find themselves. . . . It was a period of groping for the correct position to take to accord with changing times." 95 F. Supp., at 105. Of course, present events have roots in the past, and it is quite proper to trace currently questioned conduct backwards to illuminate its connections and meanings. But we think the trial judge was quite right in rejecting pre-1941 events as establishing the cause of action the Government was trying to

maintain, and adopt his division of the time involved into two periods, 1936–1941, and 1941 to trial.

It will simplify consideration of such cases as this to keep in sight the target at which relief is aimed. The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured. All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur. This established, it adds nothing that the calendar of years gone by might have been filled with transgressions. Even where relief is mandatory in form, it is to undo existing conditions, because otherwise they are likely to continue. In a forward-looking action such as this, an examination of "a great amount of archeology" [4] is justified only when it illuminates or explains the present and predicts the shape of things to come.

When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof. *Local 167* v. *United States,* 291 U. S. 293, 298. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption. Cf. *United States* v. *United States Steel Corp.,* 251 U. S. 417, 445.

---

[4] Judge Augustus Hand, "Trial Efficiency," dealing with antitrust cases, Business Practices Under Federal Antitrust Laws, Symposium, New York State Bar Assn. (C. C. H. 1951) 31–32. See also Sec. VIII, Procedure in Anti-Trust and Other Protracted Cases, a Report adopted September 26, 1951, by the Judicial Conference of the United States.

But we find not the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant-appellees which took place in 1941. It occurred seven years before this suit was commenced and, so far as we are informed, before it was predictable. It did not consist merely of pretensions or promises but was an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent because wise and advantageous for the doctors. The record discloses no threat or probability of resumption of the abandoned warfare against prepaid medical service and the contract practice it entails. We agree with the trial court that conduct discontinued in 1941 does not warrant the issuance of an injunction in 1949. *Industrial Assn.* v. *United States,* 268 U. S. 64, 84.

Appellees, in providing prepaid medical care, may engage in activities which violate the antitrust laws. They are now competitors in the field and restraints, if any are to be expected, will be in their methods of promotion and operation of their own prepaid plan. Our duty is to inquire whether any restraints have been proved of a character likely to continue if not enjoined.

Striking the events prior to 1941 out of the Government's case, except for purposes of illustration or background information, little of substance is left. The case derived its coloration and support almost entirely from the abandoned practices. It would prolong this opinion beyond useful length, to review evidentiary details peculiar to this case. We mention what appear to be some highlights.

Only the Multnomah County Medical Society resorted to expulsions of doctors because of contract-practice activities, and there have been no expulsions for such cause since 1941. There were hints in the testimony that Multnomah was reviving the expulsion threat a short

time before this action was commenced, but nothing came of it, and what that Society might do within the limits of its own membership does not necessarily indicate a joint venture or conspiracy with other appellees.

Some emphasis is placed on a report of a meeting of the House of Delegates of the State Society at which it was voted that the "private patient status" policy theretofore applied to private commercial hospital association contracts be extended to the industrial and railroad type of contracts. Any significance of this provision seems neutralized by another paragraph in the same report, which reads: "A receipt should be furnished each patient at the time of each visit, as it is understood the [industrial and railroad plan] companies concerned will probably establish a program of reimbursement to the affected employees." That does not strike us as a threat to restrict the practice of industrial and railroad companies of reimbursing employees for medical expenses and we cannot say that any ambiguity was not properly resolved in appellees' favor by the trial court.

The record contains a number of letters from doctors to private associations refusing to accept checks directly from them. Some base refusal on a policy of their local medical society, others are silent as to reasons. Some may be attributed to the writers' personal resistance to dealing directly with the private health associations, for it is clear that many doctors objected to filling out the company forms and supplying details required by the associations, and preferred to confine themselves to direct dealing with the patient and leaving the patient to deal with the associations. Some writers may have mistaken or misunderstood the policy of local associations. Others may have avoided disclosure of personal opposition by the handy and impersonal excuse of association "policy." The letters have some evidentiary value, but it is not compelling and, weighed against the other post-1941 evi-

dence, does not satisfy us that the trial court's findings are "clearly erroneous."

Since no concerted refusal to deal with private health associations has been proved, we need not decide whether it would violate the antitrust laws. We might observe in passing, however, that there are ethical considerations where the historic direct relationship between patient and physician is involved which are quite different than the usual considerations prevailing in ordinary commercial matters. This Court has recognized that forms of competition usual in the business world may be demoralizing to the ethical standards of a profession. *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608.

Appellees' evidence to disprove conspiracy is not conclusive, is necessarily largely negative, but is too persuasive for us to say it was clear error to accept it. In 1948, 1,210 of the 1,660 licensed physicians in Oregon were members of the Oregon State Medical Society, and between January 1, 1947, and June 30, 1948, 1,085 Oregon doctors billed and received payment directly from the Industrial Hospital Association, only one of the several private plans operating in the State. Surely there was no effective boycott, and ineffectiveness, in view of the power over its members which the Government attributes to the Society, strongly suggests the lack of an attempt to boycott these private associations. A parade of local medical society members from all parts of the State, apparently reputable, credible, and informed professional men, testified that their societies now have no policy of discrimination against private health associations, and that no attempts are made to prevent individual doctors from cooperating with them. Members of the governing councils of the State and Multnomah County Societies testified that since 1940 there have been no suggestions in their meetings of attempts to prevent individual doctors from serving private associations. The manager of Ore-

gon Physicians' Service testified that at none of the many meetings and conferences of local societies attended by him did he hear any proposal to prevent doctors from cooperation with private plans.

If the testimony of these many responsible witnesses is given credit, no finding of conspiracy to restrain or monopolize this business could be sustained. Certainly we cannot say that the trial court's refusal to find such a conspiracy was clearly erroneous.

The other charge is that appellees conspired to restrain competition between the several doctor-sponsored organizations within the State of Oregon. The charge here, as we understand it from paragraph 33 (i) of the complaint, 95 F. Supp., at 124, is that Oregon Physicians' Service, the state-wide organization, and the county-medical-society-sponsored plans agreed not to compete with one another. Apparently if a county was provided with prepaid medical care by a local society, the state society would stay out, or if the county society wanted to inaugurate a local plan, the state society would withdraw from the area.

This is not a situation where suppliers of commercial commodities divide territories and make reciprocal agreements to exploit only the allotted market, thereby depriving allocated communities of competition. This prepaid plan does not supply to, and its allocation does not withhold from, any community medical service or facilities of any description. No matter what organization issues the certificate, it will be performed, in the main, by the local doctors. The certificate serves only to prepay their fees. The result, if the state association should enter into local competition with the county association, would be that the inhabitants could prepay medical services through either one of two medical society channels. There is not the least proof that duplicating sources of the prepaid certificates would make them cheaper, more available or

338

would result in an improved service or have any beneficial effect on anybody. Through these nonprofit organizations the doctors of each locality, in practical effect, offer their services and hospitalization on a prepaid basis instead of on the usual cash fee or credit basis. To hold it illegal because they do not offer their services simultaneously and in the same locality through both a state and a county organization would be to require them to compete with themselves in sale of certificates. Under the circumstances proved here, we cannot regard the agreement by these nonprofit organizations not to compete as an unreasonable restraint of trade in violation of the Sherman Act.

With regard to this charge, the court found, "The sale of medical services, by Doctor Sponsored Organizations, as conducted within the State of Oregon, is not trade or commerce within the meaning of Section 1 of the Sherman Anti-Trust Law, nor is it commerce within the meaning of the constitutional grant of power to Congress 'To regulate Commerce . . . among the several States.'" 95 F. Supp., at 118. If that finding in both aspects is not to be overturned as clearly erroneous, it, of course, disposes of this charge, for if there was no restraint of interstate commerce, the conduct charged does not fall within the prohibitions of the Sherman Act.

Almost everything pointed to in the record by the Government as evidence that interstate commerce is involved in this case relates to across-state-line activities of the private associations. It is not proven, however, to be adversely affected by any allocation of territories by doctor-sponsored plans. So far as any evidence brought to our attention discloses, the activities of the latter are wholly intrastate. The Government did show that Oregon Physicians' Service made a number of payments to out-of-state doctors and hospitals, presumably for treatment of policyholders who happened to remove or temporarily to

be away from Oregon when need for service arose. These were, however, few, sporadic and incidental. Cf. *Industrial Assn.* v. *United States, supra,* at 84.

*American Medical Assn.* v. *United States,* 317 U. S. 519, does not stand for the proposition that furnishing of prepaid medical care on a local plane is interstate commerce. That was a prosecution under § 3 of the Sherman Act of a conspiracy to restrain trade or commerce in the District of Columbia. Interstate commerce was not necessary to the operation of the statute there.

We conclude that the Government has not clearly proved its charges. Certainly the court's findings are not clearly erroneous. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 395. The Government's contentions have been plausibly and earnestly argued but the record does not leave us with any "definite and firm conviction that a mistake has been committed."

As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: "Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." *Boyd* v. *Boyd,* 252 N. Y. 422, 429, 169 N. E. 632, 634.

Affirmance is, of course, without prejudice to future suit if practices in conduct of the Oregon Physicians' Service or the county services, whether or not involved

in the present action, shall threaten or constitute violation of the antitrust laws.   Cf. *United States* v. *Reading Co.*, 226 U. S. 324, 373.

*Judgment affirmed.*

MR. JUSTICE BLACK is of opinion that the judgment below is clearly erroneous and should be reversed.

MR. JUSTICE CLARK took no part in the consideration or decision of this case.