STATE ex rel. DAKOTA SAVINGS AND LOAN ASSOCIATION, Respondent v. BROSZ, Appellant

(131 N.W.2d 69)

(File No. 10124. Opinion filed October 23, 1964)

---

**Frank L. Farrar,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, for defendant and appellant.

**Woods, Fuller, Schultz & Smith,** Sioux Falls, for plaintiff and respondent.

BIEGELMEIER, P. J. Dakota Savings and Loan Association is a corporation duly organized under Title 7 of the South Dakota

Code of 1939 with its principal place of business at Sioux Falls, South Dakota. According to SDC 7.0106 no such association is permitted to transact any business unless it has been regularly authorized in writing by the Superintendent of Banks to begin the business contemplated by such association. SDC 7.0105 provides as follows:

"Whenever a certificate of incorporation has been issued to a building and loan association and such association notifies the Superintendent of Banks that it has complied with all the required provisions, it shall be the duty of the Superintendent of Banks, within thirty days, to examine such association to ascertain the motives of the promotion, the qualifications, and integrity of the officers, the proposed records to be used, whether such association has complied with all the requirements entitling it to begin business, and such other matters as may be considered proper.

"If upon such initial examination it appears that such association is lawfully entitled to begin business, the Superintendent of Banks shall forthwith give to such association a certificate of authority, under his hand and official seal, that such association is authorized to begin business.

"If the Superintendent of Banks has reason to believe that the association has been formed for any other than the legitimate business contemplated by the law of this state regulating such associations, he may withhold such certificate of authority and he may refuse to issue such certificate of authority to an association seeking to engage in business in a city or town which in his judgment does not warrant a new or additional association or, under conditions which demonstrate that the promotion of an association is actuated by any other than honorable motives."

Having notified the Superintendent that it had complied with all the provisions as provided in the section quoted above the Sup-

erintendent of Banks held a hearing at which those supporting and opposing the certificate of authority appeared. Thereafter the Superintendent of Banks entered findings of fact that the association was formed for legitimate business, that there were two such associations and six banks with three branch banks doing business in Sioux Falls, South Dakota; and nine banks in Minnehaha County outside the city. He also found that the two existing savings and loan associations and banks were adequately providing for the borrowing needs of that community and denied the application. The association applied for a writ of certiorari and after a hearing the circuit court entered a judgment that the decision of the Superintendent of Banks was reversed and set aside and the matter remanded to him with instructions to grant the certificate of authority as requested. The Superintendent of Banks has appealed.

■ Similar to the provisions of other states our Code provides the extent of review in SDC 1960 Supp. 37.0407 as follows:

"The review upon this writ cannot be extended further than to determine whether the inferior court, tribunal, board, or officer, has regularly pursued the authority of such court, tribunal, board, or officer."

This court has considered such reviews with reference to the action of the State Banking Commission in refusing permission to engage in the banking business. Wall v. Fenner, 76 S.D. 252, 76 N.W.2d 722, and McKinnon v. State Banking Commission, 78 S.D. 407, 103 N.W.2d 179. There the statutory test was whether the public convenience and necessity justified the organization of a bank. Our law also declares the action of the Commission on bank applications shall be final. SDC 6.0205(4) and SDC 6.0304. The court held in Wall v. Fenner a right, though limited, existed to review the decision of the Commission, and that the ground of an abuse of discretion was available. It was said responsibility for the findings of fact rests on the administrative body and inquiry of the court is limited in respect of factual findings, to ascertaining whether the findings are supported by competent evidence, that the decision of the Commission carried with it a presumption of correctness and should not be set aside

unless its wrongfulness was clearly shown. The burden of establishing this is on the party attacking the decision. In McKinnon v. State Banking Commission we said:

"It is the mandatory duty of the Commission, under our statute, to approve a new bank charter unless one, or more, of the statutory grounds for denial is shown by competent proof. A denial for other reasons or upon other grounds would be unreasonable and arbitrary. * * * Therefore, whenever an application is denied it is obligatory upon the Commission to disclose the grounds upon which it acted in the form of basic findings. * * * The court's authority does not extend beyond consideration as to whether the * * * order or determination is supported by substantial evidence and is reasonable and not arbitrary. * * * In reviewing administrative proceedings 'substantial evidence' means such relevant and competent evidence as a reasonable mind might accept as adequate to support a conclusion."

 It is clear that our review of the circuit court judgment here challenged is not the review of findings of fact, conclusions of law and judgment of an action tried to the court, Davis, Administrative Law Treatise, § 29.02 page 122, but is a review of the action of the Commission without regard to the circuit court judgment and limited as above described. See also Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409.

Because of this it is necessary to refer to the evidence before the Superintendent of Banks. The statistical evidence introduced is impressive and requires the conclusion that Sioux Falls is a vigorous and growing city. Its population increased from 33,000 in 1930 to over 65,000 in 1960 and of the county in which it is situated from 50,000 to over 86,000. This was during a time when the population of the State of South Dakota decreased slightly. The 1963 estimate of the city's population was in the neighborhood of 70,000 and projections by competent authorities indicate a population increase of about 7,000 for each five-year period thereafter.

The school census and statistics support these figures. The public school enrollments show a 25% increase from 1950 to 1955 and a 50% increase from that date to 1961. In 1957 the city banks showed deposits of $130,000,000 and assets of $141,000,000; in 1962 the deposits rose to $192,000,000 and assets to $211,000,000. In 1957 the two savings and loan associations had loans of $12,000,000, share accounts of $13,000,000 and assets of $14,000,-000; by 1962 the loans had risen to $36,000,000, share accounts to $36,000,000 and assets to $41,000,000. Their reserves rose during the same time from $632,000 to $1,800,000. The bank clearings for 1950 were $313,000,000, in 1956, $394,000,000 and in 1962 $633,000,000. Bank debits, another measure of business volume, were $906,000,000 in 1950, $1,075,000,000 in 1956 and $1,546,000,-000 in 1962. New construction from 1950 through 1956 totaled from four through nine million dollars a year and from 1957 through 1962 from six through eleven million dollars a year; of this the residential construction was two and one-half through seven million dollars from 1950 through 1956 and three to five million dollars from 1957 through 1962.

In a one-year period preceding the application, during the years 1962 and 1963, about thirty million dollars of residential loans were made and filed in Minnehaha county of which Sioux Falls is the county seat. Of these approximately one-fourth in number and one-third in amount were made by loaning agencies other than those located in Sioux Falls. Some of these were by correspondents for insurance companies and others by savings and loan associations located in Brookings and Beresford, South Dakota, and Pipestone, Minnesota. The Pipestone, Minnesota, loans were approximately 12% of those made. Of the two local savings and loan associations the Home Federal made 25% and the First Federal made 9½%. One witness, a realtor with five salesmen, stated that he had lost 40 sales in 1962 because he was unable to place the loans in Sioux Falls. These did not include sales where the financing was obtained from institutions outside Minnehaha County, as he did with many, but were sales lost because of the refusal of the local institutions to make the loans and the consequent delay, etc. in getting outside loans. From 35 to 50 qualifying loans were placed out of town that year, 15 or 20 of them being to the outside associations named above.

The president of the Home Federal Loan Association of Sioux Falls appeared in opposition to the granting of the certificate and his statistical information generally supported that set out above. It showed that of the loans mentioned above substantially all were made at 6, 6¼ and 6½% rate with a sprinkling of rates below and above them; the average rate was about 6.1%. In addition to this a so-called finder's fee or loan charge of 1% of the principal was charged when the loan was made. This annual fee figures about $300,000. This witness candidly stated that the applicant incorporators were persons of integrity beyond reproach, that they would operate the business efficiently and were persons his association would welcome as directors. Similar sentiments were voiced by the representative of the First Federal Savings and Loan Association who announced, however, his association owned another site on which they hoped to build and establish a branch someday. The evidence showed the applicants and incorporators were citizens, business and professional men of high standing in the community and as no point or decision was made contrary thereto that was not an issue.

Returning to the evidence of the Home Federal president he stated that it made $7,500,000 in loans in 1962; that in 1963 it had assets of $30,000,000; that it could have made loans of $10,000,000; that upon its assets it could have borrowed $5,000,000 on its own note, and $5,000,000 more or a total of $10,000,000 if it pledged assets, from the Federal Home Loan System. It had borrowed up to $2,000,000 and was eligible to borrow $8,000,000 additional. The amount of borrowing is based upon a percentage of the share accounts of the association. In sum it can be seen that the borrowing power is approximately a sixth on a note and a third on loan pledging of the assets of the association. The witness stated 80% of their loans were at 6% and that the Pipestone association was active in Sioux Falls. The First Federal Association representative also in opposition testified to their borrowing ability in similar manner up to $3,000,000 while it had borrowed from $500,000 to $750,000. Both of these men were of the opinion that it was unnecessary to charter a new association in Sioux Falls for the reason that they could and had been furnishing credit and loans and that the money market was satisfactorily supplied in Sioux Falls.

A representative of eight small-town banks outside Minnehaha County suggested the Superintendent protect them and not grant additional charters for people to make use of their funds until the funds were "here to be made use of", that loss of some of their deposits would reduce loanable funds they have for farmers and feeders. There was no evidence of loss of their deposits when First Federal was chartered or when it and Home grew.

Questions asked by the attorney for the Superintendent were directed to whether the applicant expected deposits from new sources or existing facilities and approval would increase competition for available deposits, especially from the existing savings and loan associations and small banks in the surrounding territory. The thrust of these objections is answered by the statistical evidence in the record and briefly alluded to above; growth of the two existing savings and loan associations rebut them. More particularly, yet not here all set out in detail, the statistics reveal a steady and extraordinary rise. In round numbers, as were the figures heretofore mentioned, they show the asset growth to be:

| | Home Federal | First Federal |
|------|--------------|---------------|
| 1936 | $ 89,000 | |
| 1941 | 434,000 | |
| 1945 | 1,200,000 | |
| 1951 | 2,800,000 | |
| 1952 | 3,500,000 | (opened 1-7-52) |
| 1954 | 5,850,000 | $ 1,700,000 |
| 1957 | 9,500,000 | 2,900,000 |
| 1960 | 17,000,000 | 6,900,000 |
| 1962 | 25,000,000 | 10,500,000 |
| 1963 | 30,000,000 | 12,000,000 |

It will be seen chartering First Federal in 1952 did not adversely affect Home Federal. Home's assets increased from 2.8 million on December 31, 1951 to 3.5 million on December 31, 1952 between which dates First Federal opened its doors. Their combined assets grew to over 7.5 million on December 31, 1954. Nor

is there any evidence First Federal's entry into the savings and loan field had injured the Sioux Falls banks and none appeared at the advertised hearing, except Sioux Valley which only asked to file a brief. The figures prove the contrary, growth continued. Much the same arguments were made at the hearing before the South Dakota Banking Commission November 29, 1958 on the application for a certificate of authority for Western State Bank, i. e., a new bank does not create new wealth; the deposits it gets are drawn from other banks; the needs of borrowers were being met by the existing Sioux Falls banks; an aggressive endeavor to attract business could lead to unwise and unsound credit policies and endanger the banking structure of the city and adjacent small towns. Those objections and contentions, based on the statistics presented, were then made by all the Sioux Falls and adjacent small-town banks. A transcript of that hearing appears in the record here. By coincidence or anomaly the major actors in the proceeding at bar held contrary positions. Those objections were urged by the attorney for the present applicant and the proposed president of the Western State Bank was to be, and later was, the now Bank Superintendent, who stated in an affidavit he considered these objections and the attorney's inconsistent statements in reaching his decision. The Banking Commission approved the bank application. What effect did this have on the **other** Sioux Falls banks? Deposits ran:

| | |
|------|----------------|
| 1958 | $142,810,000 |
| 1959 | 142,056,000 |
| 1960 | 154,415,000 |
| 1962 | 187,154,000 |

When the new bank's deposits are added, the total deposits are: 1960—$156,500,000 and 1962—$192,215,000. Surpluses, without regard to any transfers to capital, increased over a million dollars.

Thus far, our labors have dealt with the **factual** record before the Superintendent. An analysis of another objection made as to the ability of present facilities to meet the borrowing needs of the community deserves attention. The claim is made that as Home and First Federal have such large share accounts, Home

may borrow 10 million and First Federal may borrow 3 million from the Federal system, yet both have borrowed less than 3 million and have a 10 million fund to draw on.[1]

We have heretofore alluded to the Wall and Fenner opinions, both of which involved banks. These were cited only insofar as they concerned the right and scope of review of an administrative agency. There are distinctions between chartering, authorizing and operating banks and savings and loan associations. Authorization to do banking business rests with a Commission, that of a loan association rests with one person, the Superintendent of Banks. Banks accept deposits for times certain and immediate withdrawal, pay interest and make loans to persons generally, with or without security, as the judgment of officers dictates. Loan associations may not do so. Loans must be first made to its members on a priority of application basis; they may be made only thereafter to nonmembers from surplus or idle funds. Loans must be made to members on amply secured first real estate mortgages or a lien on their paid-up shares. When permitted, they may be made from surplus to nonmembers on first real estate mortgages or invested in government obligations. Dividends from earnings, not interest, are paid on share or savings accounts of depositors. Their essential purpose in the 133 years of their existence has been the promotion of thrift and home ownership. Their origin, growth and other factual data is avail-

1. We are not told if Home Federal used this argument against chartering First Federal, yet when analyzed its effectiveness is weakened. A city with one association grows, homes are built, loans are made on mortgages out of the capital reserve and share deposits of investors and, when needed, advances from the Federal system. Growth continues, more homes are built, more loans, mortgages and share accounts appear on its books and with them, their assets and borrowing limits increase. When a new association—as Federal in 1952—appears on the scene, Home says "We are so busy and have grown so large, we can serve this community with our available assets and great borrowing power". Thus the larger and busier they are, the greater the borrowing power and apparent weight of this argument. But First Federal says "Our community is growing so much that two should serve the community, increase availability of loans and of investors to deposit their surplus funds as well as to avoid all hint of monopoly". When Federal's entry into this bustling community has filled a need and both have been successful, the objection is of no greater validity, though two now make it. Their financial statements disprove them. The past history and current trends are not without value in contemplating the future; growth and aggressiveness of the city and the associations and a willingness of the latter to join in solid progress of the community have their place. A sluggish or stagnant region may be unable to support more financial units; here the indicia are all of vibrant growth in a community where financial institutions have contributed to the progress made.

In retrospect, one association may have been enough in the 1930's with a 33,000 population and a depression in the offing. It tripled in size from 1945 to 1952 when First Federal was chartered. In the next twelve years it gained eightfold and First Federal matched that stride

able in the annual Fact Book published by United States Savings and Loan League. The method of operation of honestly run associations is a built-in insulation against failure. From 1950 to 1960 the number of associations grew from 6,000 to 6,250. Average assets were $13 million; 50% had assets of less than $5 million; 20% had assets from $5 to $10 million. Only 12% had assets of $25 million or more. Population average per association was about 29,000 and 22,000 per main or branch office. See 1962 Fact Book, pp. 79 and 83. Home Federal has outgrown and is larger than 88% of these institutions.

In addition to the evidence received at the hearing it was announced by the Superintendent's attorney the record would be held open 20 days to permit statements to be filed by anyone favoring or opposing the application. Under this leave, annual state reports in book form were filed, as were petitions favoring the applicant by 38 business and professional men and stating their reasons. A realtor filed a letter stating in 12 years he had constructed over 1,000 new homes and brokered the mortgages on them; he listed the companies in which they were made; they totaled several million dollars of which many were outside of Sioux Falls; on these experiences he ventured the opinion an added association was much needed. Another realtor wrote he was of the same view; he was asked by letter about his real estate loan applications for 1962 and details thereof; his answer stated 22 were financed locally and 38 required out-of-town financing. Twelve separate statements by individuals relating to specific and general refusal of loans by the local associations and their closing with out-of-city institutions, etc. were filed. One bank wrote it had no objection and another (because one of applicant's incorporators was a customer) said it took no position as to granting the charter. We assume the Superintendent was not so naive as to place great weight on these two letters, nor to expect the Executive Secretary of the South Dakota Bankers Association to do other than write his "personal recommendation" that the Superintendent refuse the application "at the present time".[2] To complete the record, the eight small-town

2. The Superintendent's decision reads "that a new or additional savings and loan association is not warranted at the present time."

banks and Sioux Valley Bank filed a brief in opposition. One point made therein was applicant has not shown it could function normally as to earnings and expenses or its probable success as a business venture and assuming these were required. Cf. Goldy v. Gerber, Colo., 377 P.2d 111. Admittedly the incorporators who had subscribed to and must pay $105,000 for their stock, were reliable persons of high integrity . As denial of the application was not made on either of the above grounds, they are not in issue here and are only mentioned to show they were not overlooked.

The complaint that another association might draw from other investments or bank accounts, and not bring in "new money" was in no way supported. As shown the banks' and associations' capital, assets and share accounts all grew during the past 20 years. What is "new money", where it comes from, or how it is created, changed in form or distributed is a matter of conjecture. One answer to a new association's ability to survive, grow or succeed and the possible source of its assets appears in Ex. 29, filed by Home Federal which states their ability to attract money from six named sources is in excess of their ability to put it out.

█ Some persons gave their opinion another association was needed, desirable or a fine thing; others that it was not. Some of these were based on knowledge of the facts or part of them; some were motivated by their occupations, employment or interest in the proceeding. The legislature has recognized the distinctions between banks and building and loan associations by fixing a standard of "public convenience and necessity" for the former and a different standard for refusal to an association of a certificate to engage in business in a city which in the judgment of the Superintendent "does not warrant a new or additional association". The word "warrant" is not further defined by statute; used in this sense it can be said to mean to "give sufficient grounds or good reasons for". Webster's New International Dictionary, Second Edition.

The Superintendent found the existing savings and loan associations were "adequately providing for the borrowing needs

of that community" and through the thread of the testimony, it may be the witnesses, the Superintendent and others present had the bank standard in mind, though he stated he denied it under the "does not warrant" clause. A reading of all the evidence indicates little, if any, disputed facts, most of them statistical; substantially all support the application. To refer to all would unduly extend this already long opinion.

██ ██ They show an additional association is warranted and the decision of the Superintendent to the contrary was clearly erroneous. A finding or conclusion is clearly erroneous when although there may be some evidence to support it, a reviewing court is left with the definite and firm conviction that a mistake has been committed. United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 72 S.Ct. 690, 698, 96 L.Ed. 978 and see Davis, Administrative Law, § 29.02. This amounts to an abuse of discretion. See Wall v. Fenner, 76 S.D. 252, 76 N.W.2d 722. In view of the foregoing it is unnecessary to consider other issues presented to the circuit court and argued here.

As to the disposition of the appeal we are all in agreement in affirming the judgment of the circuit court insofar as it reversed the Superintendent's decision denying the certificate of authority. Two of our colleagues would not affirm that part which remands the proceeding to the Superintendent with instructions to grant the certificate. Such a direction was affirmed in Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409 and compelled when accompanied with a pending mandamus action in State ex rel. Spurck v. Civil Service Board, 226 Minn. 240, 32 N.W.2d 574. On this record all that remains is the ministerial act of issuance of the certificate. We do not believe it necessary, however, to consider that phase as appellant has not in any way questioned the form of the order in that respect. The judgment of the circuit court is therefore affirmed.

HANSON and HOMEYER, JJ., concur.

ROBERTS and RENTTO, JJ., dissent in part.

RENTTO, J., (dissenting in part). As indicated in the majority opinion commercial banks and savings and loan associations

are unlike in their nature and purposes. While both are financial institutions their relation to and functions in a community are vastly different. That the legislature recognized this is manifest in the requirements which it prescribed each would have to satisfy to secure operating authority. Before a bank is authorized to do business it must appear that its organization is justified by "public convenience and necessity". In the case of savings and loan associations authority to do business is to be withheld if the city or town in which it proposes to operate "does not warrant a new or additional association". These standards are not synonymous.

The record compels me to the conclusion that the Superintendent, in denying the authority here requested, applied the bank standard of "public convenience and necessity". See Wall v. Fenner, 76 S.D. 252, 76 N.W.2d 722. In so doing he proceeded on an erroneous theory of law. For that reason the circuit court reversed the action of the Superintendent. I concur in this action. However, I am unable to affirm the remainder of the judgment which directs the Superintendent to grant the requested authority.

The decision whether such certificate should issue has been legislatively assigned to the Superintendent. When a court is called on to review his action its scrutiny does not extend beyond the question whether the Superintendent has acted within his constitutional and statutory powers and whether his determination is supported by substantial evidence and is reasonable and not arbitrary. The court may not be concerned with the weight of the evidence and cannot substitute its judgment and discretion for that of the Superintendent. In re Sioux Falls Traction System, 56 S.D. 207, 228 N.W. 179; Vander Werf v. Board of Railroad Commissioners, 58 S.D. 586, 237 N.W. 909; Application of Dakota Transportation, Inc., 67 S.D. 221, 291 N.W. 589; Wall v. Fenner, supra; McKinnon v. State Banking Commission, 78 S.D. 407, 103 N.W.2d 179; 2 Am.Jur.2d, Administrative Law, § 613 and § 675.

The interpretation of a statute involves a question of law and is a judicial function. Bandy v. Mickelson, 73 S.D. 485, 44 N.W.2d 341, 22 A.L.R.2d 1129. Consequently, it is for us to say

what the legislature intended when it declared that the authority shall be withheld if the location in question "does not warrant a new or additional association." The circuit court did not attempt a definition of this phrase.

The remand approved by the majority directs the order which the Superintendent is to enter. This I feel is improper. In 2 Am.Jur.2d, Administrative Law, § 763, the rule is stated thus:

> "Just as the courts do not have the power to substitute their discretion and judgment for that of the administrative agency in passing upon the correctness of the matter under review, it is also held that they have no such power after they have determined that the agency has erred, and cannot or will not enter or direct the order which shall be entered* * *"

Since the Superintendent viewed the facts in the light of an improper standard in arriving at his determination he has not performed his statutory duty. It seems to me that by this remand the circuit court is substituting its discretion and judgment for that of the administrative agency.

We have recognized that when the facts are undisputed and no conflicting inferences respecting the ultimate fact can be drawn that a court on review may enter or direct the order to be entered. Lang v. Jordon Stone Co., 61 S.D. 330, 249 N.W. 314. The factual issues then are matters of law. Whether that situation exists here cannot be determined absent a definition of the legislatively prescribed standard. Without such factual foundation the court is without power to direct the order to be entered and this lack of power is for our consideration whether the parties urge it or not.

I would reverse the judgment with directions to the circuit court to remand the case to the Superintendent for a new determination, on the record already before him, giving effect to the standard as defined by us.

ROBERTS, J., concurs in dissent.