Titone, J.
(dissenting). Stressing the goals of improving the efficiency of our courts and expediting the disposition of pretrial motions in criminal cases, the majority has ratified yet another legislative effort to transfer the duties of elected, constitutional Judges to administratively appointed functionaries. While recognizing as a general principle the existence of a core of judicial authority that is both "nondelegable and exclusive” (majority opn, at 608), the majority nevertheless declines to include in that category what I consider to be one of the most important areas of fact finding: determinations of credibility based on the witnesses’ appearance, tone of voice and demeanor. Since, in my view, the majority’s analysis assigns too little importance to the principle that "[t]he one who decides must hear” (Morgan v United States, 298 US 468, 481) and, as well, accords insufficient weight to the individual liberty and privacy interests that are at stake in these pretrial proceedings, I must, respectfully, dissent.
Initially, I do not quarrel with the goals of alleviating the backlog in the criminal courts and expediting the movement of cases through the system. As the majority notes, protracted delays in resolving criminal charges undermine the fairness of our criminal justice system and erode the public’s confidence in its ability to play a meaningful role in the growing crime problem confronting our society. Further, as the 1983 Report prepared for former Chief Judge Cooke demonstrated, there can be no doubt that our State’s retired Judges, with all of their special knowledge and experience, have a substantial and important contribution to make in improving the efficiency of our courts (see, Report of Comm to Utilize Services of Retired Judges, reprinted in 5th Ann Rep of Chief Administrator of Courts [1983]). However, our role as a reviewing court is not to endorse or reject the legislatively identified aims, but rather to determine whether the manner in which those aims have been implemented, by both the Legislature and the Chief Administrator, comports with constitutional *612 standards. It is to those constitutional considerations that I now turn.
Article VI, §§ 10 and 11 of the State Constitution provide for the continuance of the County Courts, set forth the terms and qualifications of County Court Judges and establish the jurisdiction of these courts over "all crimes and other violations of law.” Although the majority makes the sweeping assertion that these constitutional sections merely "provide * * * for the organization and jurisdiction of County Courts” (majority opn, at 609), the majority also acknowledges the County Courts’ "nondelegable and exclusive authority” to decide suppression motions, making clear its own view that there are, in fact, limits on what tasks may be removed from the list of traditional judicial responsibilities and assigned elsewhere. Thus, notwithstanding the Legislature’s constitutional power to prescribe procedural rules to govern the practice in the County Courts (NY Const, art VI, § 30; see, Matter of A. G. Ship Maintenance Corp. v Lezak, 69 NY2d 1), we are all evidently in agreement on the basic principle that article VI, §§ 10 and 11 establish a bedrock of inalienable judicial authority and duty. It is in relation to the precise contours of this authority that we differ.
The majority concludes that CPL 255.20 (4) does not result in an impermissible delegation of judicial authority because it is the County Court Judge who decides whether a reference should be made, it is the Judge who "holds the tether on the case throughout the completion of the referral” and, most importantly, it is the Judge who, despite a reference to a Judicial Hearing Officer (JHO), retains the plenary power to accept, reject or modify the JHO’s determination — and even to conduct a de novo review where necessary (majority opn, at 608-609). However, in this context, "[o]ne of the essential elements of the determination * * * is the weighing and appraising of testimony.” (Holiday v Johnston, 313 US 342, 352.) In my view, a Judge who merely "holds the tether” and does not personally preside at a suppression hearing cannot realistically be expected accurately to perform that task.
As this Court has previously observed, there are "peculiar advantages [to] having seen and heard the witnesses” that cannot be replaced by a review of the cold record (People v Prochilo, 41 NY2d 759, 761; see, United States v Oregon Med. Socy., 343 US 326, 339). Thus, by authorizing references to JHOs with the understanding that they will preside at sup *613 pression hearings and make recommended "findings of fact” and "conclusions of law”, CPL 255.20 (4) permits the transfer of a critical aspect of the judicial decision-making process to nonjudicial officers and' thereby results in an impermissible delegation of the elected County Court Judges’ authority. Moreover, the impairment can hardly be characterized as de minimis, since the vast majority of suppression determinations involve, as the primary fact-finding task, an assessment of the conflicting witnesses’ truthfulness.[1]
Contrary to the majority’s analysis, the Judge’s apparent implied authority to hold de novo proceedings (see, 1983 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 255.20, 1990 Cum Ann Pocket Part, at 190), which the Court has now formally adopted as law, does not ameliorate the statute’s constitutional infirmity. Even assuming that a residual judicial power to go beyond the record developed before the JHO was contemplated, it is evident that the Legislature did not intend that such power would be used with any degree of frequency, since routine resort to de novo proceedings would reduce the JHOs to "just another layer of delay and red tape” (id.). Moreover, the availability of de novo proceedings in those "exceptional instances where the court * * * want[s] to hear the parties or their counsel” (id.) does not provide a solution for the bulk of ordinary cases in which what I believe to be the nondelegable fact-finding duties of the court are, in fact, delegated to JHOs.
It must be stressed that the delegation of such an important judicial function to nonjudicial officers represents a substantive constitutional infirmity and not a mere technical objection. By adopting article VI, §§ 10 and 11 of the State Constitution, the people of this State have indicated their wish to have matters within the jurisdiction of the County Courts determined by Judges who are county residents and are *614 chosen by the county’s electors every 10 years (see, NY Const, art VI, § 10 [a], [b]). Presumably, the provision for election to a 10-year term represents the people’s chosen method of preserving a measure of judicial independence while, at the same time, ensuring a degree of judicial accountability. This balance is upset, and the accountability/independence mechanism is circumvented, when substantial decision-making functions are transferred from County Court Judges to administratively designated JHOs (see, 22 NYCRR 122.2 [c], [d]). Ironically, it is in the suppression hearing context, where the enforcement of basic constitutional rights is at stake and the credibility of law enforcement personnel must be judged, that the polar values of independence and public accountability take on particular importance. "Indeed, it is precisely in resolving constitutional issues that are dependent on questions of credibility as between a government official and one accused of [a] crime that a detached and independent arbiter may be most indispensable.” (United States v Raddatz, 447 US 667, 711 [Marshall, J., dissenting].) And, contrary to the majority’s suggestion (majority opn, at 610), an appointed JHO’s purported neutrality is no substitute for the independence and long-term public accountability of an elected Judge.
As to the majority’s disposition of appellant’s due process argument, I find myself once again, unable to agree. Of course, as the majority observes, the Supreme Court majority’s decision in United States v Raddatz (447 US 667, supra) is all but dispositive of any claims appellant might make under the Due Process Clause of the Federal Constitution. However, we remain free to chart a separate course under our own State constitutional due process provisions (NY Const, art I, § 6; see, e.g., People v Vilardi, 76 NY2d 67). Although the majority has apparently chosen to follow the Raddatz analysis in resolving appellant’s State constitutional claim, I would opt for a different approach in light of our long-standing recognition of the central importance of suppression hearings in many criminal proceedings (see, People v Anderson, 16 NY2d 282). Indeed, while I agree with the majority’s general premise that, like its Federal counterpart, due process analysis under the State Constitution requires a balancing of the parties’ interests, I cannot concur in its conclusory assertion, with no reference at all to the accused’s weighty interests, that the opportunity to present evidence to a "neutral fact finder” is all the process that is due (majority opn, at 610).
The difficulty I have with the majority’s position, as well as *615 with the position of the Raddatz majority, is their assumption that the accused’s interest in the outcome of a suppression hearing is worthy of only diminished protection because the ultimate issue of guilt or innocence is generally not involved. The Raddatz majority went even further, suggesting that a fair analogy can be made to the interests at stake in administrative adjudications, which are also often made by agency boards on the basis of cold records (447 US, at 680). The latter suggestion is unacceptable because it ignores the obvious fact that, unlike most administrative proceedings, the outcomes of suppression hearings implicate the basic liberty interests of the accused. Furthermore, although not considered as a serious or important factor by either the Raddatz court or this Court, the results in these pretrial suppression hearings implicate the constitutional rights of privacy and freedom from compelled and, in some instances uncounseled, self-incrimination — matters which are of paramount concern to all citizens.
Most importantly, the majority’s analysis in this case is wanting because it ignores that, as a practical matter, "the determination of the motion to suppress often determines the ultimate question of guilt.” (People v Anderson, 16 NY2d 282, 288, supra.) Even where it is not actually determinative, "a denial of a motion to suppress evidence is a crucial step in a criminal prosecution; it may often spell the difference between conviction or acquittal” (People v Lombardi, 18 AD2d 177, 180, affd 13 NY2d 1014, quoted in People v Anderson, supra, at 287). Accordingly, we have held that a defendant has the same "absolute” right to be present at a suppression hearing as he has to be present at trial and that "[e]xpediency may not dictate procedural changes” in that result (People v Anderson, supra, at 287-288).
I would apply the same principles here and conclude, as did Justice Marshall in Raddatz, that "[a] rule that would allow a criminal defendant to face a jail sentence on the basis of factual findings made by one who has not heard the evidence is * * * foreign to notions of fair adjudicative procedure embodied in the Due Process Clause.” (United States v Raddatz, 447 US, at 697 [Marshall, J., dissenting].) Even in the case of pretrial suppression hearings, "our constitutional tradition rejects the notion that factual findings in criminal cases may be made by an official who acts in isolation and on the basis of a cold record.” (Id., at 695-696.) Since that is precisely what CPL 255.20 (4) authorizes when it permits the delegation *616 of the duty to preside and make fact findings to JHOs, I would hold that statute to be violative of our State Constitution.
Before closing I must note my concern with the apparently growing trend to replace constitutional Judges with JHOs as a means of alleviating the overcrowded dockets in our courts. Under CCA 110 (e), "hearing officers” appointed from a list by the local Administrative Judge may try and determine litigated, nonjury controversies in the Housing Part of New York City Civil Court, may enter final, appealable judgments and may punish for contempt. Shortly after this legislative delegation of judicial authority was upheld by the Appellate Division (Glass v Thompson, 51 AD2d 69),[2] the Legislature changed the title of the position from "hearing officer” to "housing judge” to invest these appointees "with as much authority and dignity as possible” (Babigian v Wachtler, 133 Misc 2d 111, 114, affd 126 AD2d 445, affd 69 NY2d 1012). Similarly, in 1985 the Legislature enacted the Child Support Enforcement Act and gave appointed "hearing examiners” substantial adjudicative responsibilities in Family Court (L 1985, ch 809; see, Family Ct Act §§ 433, 439). Finally, as the majority notes, there have been recent, albeit unsuccessful, efforts "to authorize expanded utilization” of JHOs in criminal proceedings (majority opn, at 608).[3]
In light of this recent history, there is much room for concern about the gradual replacement of the traditional judicial system, with all its rigidities and awkwardness, in favor of one that is more efficient and flexible but rests heavily on the use of nonjudicial personnel. While the chronic logjams in our courts, the threat of inundation and breakdown in some of the most critical parts of the justice system and the insistent public pressure to "process” cases more swiftly make this a tempting option, I am hesitant to embrace it too readily, lest "principles that were meant to endure be sacrificed to *617 expediency.” (United States v Raddatz, 447 US, at 714 [Marshall, J., dissenting].) Accordingly, I dissent.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Hancock, Jr., concur with Judge Bellacosa; Judge Titone dissents and votes to reverse in a separate opinion. Order affirmed.

. This is a case in point. At his suppression hearing, appellant testified that, while in handcuffs at the police station, he had made specific and repeated requests for counsel, all of which were ignored. He further stated that the consents he had given for the searches of his car and home were obtained as a result of police threats that the vehicle and house would otherwise be "taken apart” and "torn up”. Appellant’s wife stated that similar threats had been made to her when the police arrived at the house for the search. The police officers involved in the questioning and searches gave an entirely different version of events. Thus, the disposition of appellant’s motion to suppress his statements and physical evidence turned largely on a determination of the relative credibility of appellant’s and the investigating officers’ conflicting testimony.

. Our Court has not squarely addressed the issue presented in Glass. In Babigian v Wachtler (69 NY2d 1012), which involved a challenge to a subsequent related measure, we merely noted that because the litigants had assumed the correctness of the Glass decision we would do the same for purposes of deciding the issue then before us.

. Ironically, despite the majority’s reliance in this case on the trial court’s continuing "nondelegable and exclusive authority to decide the suppression motion” (majority opn, at608-609), one of the proposals to which the majority has referred would have transferred to JHOs the power to "hear and determine”, rather than merely to "hear and report”, in certain designated matters (Ann State of Judiciary Message of Chief Judge, 1989-1990, at 33, cited in majority opn, at 608).