**UNITED PARCEL SERVICE, INC., Plaintiff,**

v.

**LOCAL 25 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA (LOCAL 25), et al., Defendants.**

Civ. A. No. 76–3429–F.

United States District Court, D. Massachusetts.

Oct. 14, 1976.

James T. Grady, Grady & McDonald, Boston, Mass., for defendants Local 25, Daniel Halloran and William McCarthy.

Paul T. Smith, Jeffrey M. Smith, Harvey Peters, Boston, Mass., for defendants Trinidad, Fitzpatrick, Tallas, Beals, Belding, Calcagno, Coletta, Coviello, Curtin, Evans, Kelly, Kenney, Maguire, Mitza, Scolponeti and Splaine.

## OPINION AND RULING ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

JULIAN, Senior District Judge.

Plaintiff has moved under Rule 65 of the Federal Rules of Civil Procedure and Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, that a temporary restraining order be entered restraining the defendants from engaging in certain allegedly unlawful acts in the course of their picketing activity at the plaintiff's place of business in Watertown, Massachusetts.

The dispute between plaintiff and defendant Local 25, as collective bargaining representative for certain UPS employees, involves a labor dispute within the meaning of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, and as defined in § 13 of said Act, 29 U.S.C. § 113(c).

A hearing on the motion was held on September 23, 24 and 27, 1976, after due and personal notice had been given in the manner directed by the Court to all persons against whom relief is sought, except defendant Robert L. Smith,[1] and also to the chief of those public officers of the Town of Watertown charged with the duty to protect plaintiff's property.

As required by 29 U.S.C. § 107, the Court heard the testimony of the witnesses in open court (with opportunity for cross-examination) in support of the allegations of plaintiff's complaint made under oath, and such testimony in opposition thereto as was offered by the defendants.

On all the evidence presently before the Court, consisting of the testimony of nine

Robert Glass, Nutter, McClennon & Fish, Boston, Mass., for plaintiff.

---

1. As to defendant Smith, a return of diligent search has been filed.

witnesses called by the plaintiff, one witness called by the defendants, 47 exhibits, and admissions contained in the defendants' answers to the allegations in the plaintiff's complaint, the Court makes the following findings of fact.

Plaintiff United Parcel Service, Inc. (UPS) is a New York corporation, having its principal place of business in Greenwich, Connecticut. Plaintiff is engaged in the business of picking up, transporting and delivering parcels throughout most of the United States. Plaintiff is qualified to do business in Massachusetts, and owns and operates several facilities in Massachusetts known as operating centers, including an operating center at Watertown which is the scene of the acts alleged against the defendants.

Defendant Local 25 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 25) is a labor organization within the meaning of Section 2(5) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152, and represents certain employees of UPS, including all of the individual defendants except William J. McCarthy, Daniel Halloran, Andrew Merola and John Trinidad, who, though members of Local 25, are not employees of plaintiff.

Plaintiff UPS is an employer in an industry affecting commerce within the meaning of Section 2(7) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152.

Local 25 is a voluntary unincorporated association whose office and place of business are located in Boston, Massachusetts.

Defendant William J. McCarthy is a resident of Massachusetts and is the president of Local 25.

Defendant Daniel Halloran is a resident of Massachusetts and an officer of Local 25. He testified that he holds the office of Trustee and is not a business agent of the Local. The bylaws of the Local, introduced in evidence by the defendants (Exh. E), list Halloran as business agent and not as trustee.

Defendants Salvatore Calcagno and Joseph Scolponeti are residents of Massachusetts, employees of UPS, members of Local 25, and respectively shop steward and alternate shop steward for Local 25 at UPS's operating center in Watertown.

The remaining individual defendants, George Beals, William Belding, John Coletta, John Evans, Louis Coviello, James Curtin, William Fitzpatrick, Francis P. Kelly, Gary Kenney, William Maguire, Robert Mitza, James O'Leary, Robert L. Smith, James Splaine and Peter Talas, are employees of UPS, residents of Massachusetts (except for Kenney, who is a resident of New Hampshire), and members of Local 25.

For a number of years UPS has entered into collective bargaining agreements with 18 locals of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters), including Local 25. The last such "New England Area Agreement" expired on April 10, 1976, after which time UPS employees who were members of Local 25 and other locals of the Teamsters continued to work without a contract.

Commencing on April 21, 1976, and continuing until September 10, 1976, UPS engaged in contract negotiations with Local 25 and with approximately 75 other locals comprising the Eastern Conference of the Teamsters in an effort to reach agreement on a labor contract for the Eastern Seaboard Region of the United States, from Maine to the Carolinas. Twenty-seven bargaining sessions were held. During the week of August 23, 1976, two federal mediators, including a national and the regional mediator for the Federal Mediation and Conciliation Service, participated in the negotiations in an effort to bring about an agreement between the parties. On September 9 and 10, 1976, UPS and the Teamsters, including Local 25, met with James Scearce, Director of the Federal Mediation and Conciliation Service, in an effort to resolve the differences between UPS and the Teamsters.

The contract negotiations between UPS and the Teamsters reached an impasse on

September 10, 1976, and no further bargaining sessions have been held since that date.

The UPS employees who are members of the Teamsters walked off the job at 7:15 p. m. on Wednesday, September 15, 1976. The strike affects 15 states (and the District of Columbia) in the Eastern United States, including Massachusetts, and has caused UPS to shut down its pickup, transportation and delivery service in all the affected states.

At the time the strike commenced, UPS had approximately 58,000 parcels belonging to its customers in its Watertown operating center. The maximum size of the parcels is 108 inches and maximum weight 50 pounds. UPS has attempted to contact the shippers of the parcels in order to notify them of the strike and of the suspension of the UPS service in the East. All customers, whether shippers or consignees, who express concern about their parcels have been and are being advised by UPS personnel that they may come to the operating center where the parcels are located and retrieve them. Numerous customers have come to the UPS center in Watertown to retrieve their parcels. Of the 58,000 parcels at the center at the commencement of the strike on September 15, about 39,700 undelivered parcels still remained there on Friday, September 24. The customers came on foot or by motor vehicle. Some customers have as many as 1,000 parcels immobilized at the center.

The UPS center in Watertown is situated at the corner of Arlington Street and Coolidge Avenue. The center is partially fenced in and the means of ingress and egress consist of # 1 gate on Arlington Street and gates 2, 3, 4, 5 and 6 on Coolidge Avenue. At all relevant times the only gate that was not completely closed was gate 4 on Coolidge Avenue. This was the gate designated by UPS personnel to be used by customers who came, whether on foot or in vehicles, to retrieve their parcels.

Since Thursday morning, September 16, 1976, defendant Local 25 and the individual defendants have engaged in picketing activity at UPS's Watertown operating center, primarily at gate 4 on Coolidge Avenue. Gate 4 is about 35 feet wide. During the strike the gate has been open from 9 a. m. to 5 p. m. to permit the passage into and out of the operating center for persons on foot or in vehicles.

Beginning on September 16, 1976, UPS has kept gate 4 open to admit shippers and consignees who desire to retrieve their packages from the Watertown operating center. Commencing on September 16, 1976, and for several days thereafter until the filing of the complaint, whenever such customers approached the gate a large number of pickets closed their ranks, crowded around the persons or vehicles desiring to get through the gate, and physically obstructed them and prevented them from getting through. A large number of UPS customers have been and are being obstructed, shoved, pushed and assaulted in this manner. Of the several hundred customers who have come to the Watertown operating center to retrieve their parcels, only relatively few have been able to get through the massed picketing maintained by the defendants. Most of those who did get through the pickets were able to do so only with the help of police officers detailed to the scene by the police department of the Town of Watertown. Many still photographs and two action films introduced in evidence, and the testimony of nine witnesses who were present at the scene, show the blocking of gate 4 by the pickets and the violent and turbulent nature of the picketing.

Defendant McCarthy, as president and principal executive officer of Local 25 (see Section 7(D) of the bylaws of the Local, Exh. E) and the officer in charge of all labor controversies involving Local 25 (see Section 7(G), id.) delegated defendant Halloran to handle the strike at the UPS center in Watertown. McCarthy was not present at the scene of the picketing. I find that in his absence Halloran was in charge of the strike operations for Local 25 at the UPS center in Watertown; that he was present at the center and, acting as the authorized representative of Local 25, organized, di-

rected and supervised the picketing, including the tactic of the massing of pickets in large numbers at and near gate 4 and of using force and violence to prevent plaintiff's customers from entering its premises to retrieve their parcels; that on Thursday, September 16, he told the plaintiff's district labor relations manager that persons picking up medical supplies would not be bothered, but otherwise the picket line would be "beefed up" and "active" picketing would take place.

Defendant Halloran took his post across the street (Coolidge Avenue) from gate 4 about 50 feet away and directed and supervised the picketing, using from time to time defendants Trinidad, Calcagno and Scolponeti as his messengers and aides to communicate instructions to the picket line.

Whenever customers approached gate 4, whether on foot or in a motor vehicle, the pickets massed at or near the gate and by blocking, pushing, shoving, and sometime kicking, the customers,—prevented them or attempted to prevent them from entering the UPS operating center. The pickets pushed, shoved and resisted police officers who were helping or trying to help customers get through. The pickets shouted obscenities and offensive epithets at customers. Some of them hurled stones at customers' cars. Hundreds of one-inch-long nails with large, flat heads were scattered in the area. The nails looked new. There was evidence that they had not come from broken parcels.

At some time or another, and to a greater or lesser extent, all the individual defendants except defendants McCarthy and Halloran physically joined and participated in the concerted action of massing, blocking, pushing and shoving plaintiff's customers, preventing them or attempting to prevent them from entering plaintiff's center; and in pushing, shoving, blocking and resisting police officers who were trying to protect the customers from the pickets and open a path for them through gate 4 to retrieve their parcels.

A UPS customer testified that on September 20 he was notified that his package containing films was at the center in Watertown. When he arrived to claim it he was blocked by about 50 pickets. A wedge was formed by about 20 police officers to help him get through the massed pickets. He was pushed and shoved by the pickets and knocked to the ground. While down, a liquid was poured on his head. He did not get his parcel that day.

In addition to participating at one time or another in the violent mass picketing that has been described, the following specific acts were done by individual defendants:

Defendant Merola, a member of Local 25, but not an employee of plaintiff, parked across the street from gate 4 with a sign on his car which read, "Elect Merola Business Agent," and, using a loud-speaker, exhorted the pickets to close up the line whenever a customer approached.

Defendant Trinidad, not an employee of UPS, but a member of Local 25, went back and forth across Coolidge Avenue between Halloran and the pickets on September 16, 17, 18, 20 and 21, in each instance conferring with Halloran. When customers approached the gate Trinidad urged pickets to "push back," "fight back, don't let them through; this means your job."

Defendant Belding on September 20 jumped on the hood of a car that was attempting to enter the center and held a picket sign in front of the driver to obstruct his vision.

Defendant Calcagno, shop steward at UPS center and a member of Local 25, on September 16 walked back and forth between Halloran and the picket line.

Defendant Coletta asked one of plaintiff's supervisors to stop customers from crossing the picket line so they wouldn't get hurt; and told him also that more violence would occur if vehicles did not stop coming.

Defendant Kelly threatened a loss prevention supervisor of UPS, in substance as follows: "I'll get you. I'll send men down to rape your wife and harm your children."

Defendant Kenney kicked three or four customers in the shins; he was in the front

rank of the picket line and in direct physical contact with police officers on September 16 and 17; he told one customer, "I know where your car is parked and I'll be there when you get back." He was identified by a witness as the man being held by a police officer in photograph Exhibit 11.

Defendant Maguire shouted obscenities and offensive epithets at a Chinese couple; asked them if their packages had "fish heads, rice, Chinese menus and chopsticks"; he asked the woman if she had "dildoes"; he called the couple "fucking gooks." (Note: Merriam-Webster International Dictionary (2d Ed.) defines a dildo as an artificial phallus.)

Defendant Mitza attempted to knock a package out of a customer's hands; kicked some customers in the shins.

Defendant O'Leary punched customers and kicked them in the shins. He struck with his fist the windshield of a Volkswagen bus about to enter gate 4, broke the windshield and injured his hand.

Defendant Scolponeti, alternate shop steward at UPS, aided defendant Halloran in substantially the same way as Calcagno and Trinidad. He also scratched a customer's automobile with a nail which he took out of his pocket.

Some other acts done by unidentified pickets were these:

One picket shouted at an 84-year-old woman customer to "lift her leg and show her beaver."

Rocks were thrown from across Coolidge Avenue at the UPS building, breaking windows and denting cars.

Police were pushed into the path of cars, causing at least one police officer's feet to be run over. Some police officers were shoved by the pickets against the wire fence.

On September 21, at about 5 p. m., a man attempted to come out of plaintiff's building but was blocked and shoved back by the pickets. Someone swung at him. He eventually emerged with police assistance.

The car shown in photographs Exhibits 4 and 6 was kicked, dented and rocked from side to side.

The police have been unable to furnish adequate protection to the plaintiff in the conduct of its business at its center in Watertown.

Gate 4 was the only gate that was used during the strike and was kept open from 9 a. m. to 5 p. m. The mass picketing was concentrated at or near gate 4. The number of men picketing the area at or near gate 4 was far in excess of the number reasonably necessary to conduct lawful picketing activity and far in excess of the number of police officers detailed to the scene by the Watertown Police Department. The number of pickets was estimated to have reached as high as 125.

On the testimony of the police lieutenant in charge of the assignment of police officers to the strike area and the testimony of other police witnesses, I find that the largest number of police officers assigned to date at the scene of the picketing during each day of the strike from Thursday, September 16, to and including Wednesday, September 22, was as follows:

| Date | | | Number of Police Officers |
|------|------|------|-----|
| Thursday, | Sept. | 16 | 10 |
| Friday | " | 17 | 15 |
| Saturday | " | 18 | 15 |
| Monday | " | 20 | 38 |
| Tuesday | " | 21 | 25 |
| Wednesday | " | 22 | 31 |

It has been testified by one of the plaintiff's supervisory employees that the plaintiff will be required to reimburse the Town of Watertown for all salaries paid police officers for performing police duty at the center during the strike. He estimated the cost to be as high as $4,000 a day.

Despite the presence of the police and such protection and assistance as they were able to provide, the great majority of the customers who came to the center for their parcels did not succeed in getting through the massed picket line into the center. The police themselves were pushed and shoved

and in some instances knocked down by the pickets. Nine pickets were arrested by the police for various offenses.

Nothing was done by defendant Halloran or any other representative of Local 25 to deter or dissuade the pickets from engaging in unlawful acts while picketing, and although he testified that in his opinion not more than 12 pickets were needed to picket the UPS center in Watertown, he took no action to reduce the large number of pickets actually used.

The immediate object of defendants' concerted violent picketing was to make it impossible for the plaintiff to deliver the parcels that had accumulated at the center to the customers who came there to claim them, and to disrupt plaintiff's operations at the Watertown center. The ultimate object of the defendants' unlawful acts was to cause such damage and loss to plaintiff's business as would coerce the plaintiff to submit to defendants' demands in the labor dispute.

Under the provisions of the Interstate Commerce Act, 49 U.S.C. § 20, par. (11), plaintiff UPS, as a common carrier licensed and regulated by the Interstate Commerce Commission, is liable to its customers for loss, damage or injury to property entrusted to it by such customers and for failure to deliver the same.

On the issue of the likelihood of the resumption of the defendants' unlawful activities at the center, the Court makes the following findings.

From the very beginning, this strike has been characterized by concerted acts of violence by defendants against persons who are in no way involved in the labor dispute—the plaintiff's customers. The violence erupted on the very first day of picketing and continued unabated until the complaint in this case was filed. This is not a situation where prolonged peaceful picketing had no effect and tempers eventually became inflamed; rather, the defendants decided to use violence as a first resort at the beginning of the strike. Further, as appears from the films introduced in evidence by plaintiff and the testimony of plaintiff's nine witnesses, the acts of violence were unprovoked, flagrant, and dangerous to plaintiff's customers and to the police.

Defendant Local 25 is the same union that was a defendant in *Charles D. Bonanno Linen Service v. McCarthy*, 1 Cir., 532 F.2d 189, 1976. In that case the district judge held a hearing during which he received affidavits detailing acts of violence, but declined to issue the temporary restraining order requested by the plaintiff after receiving the assurances of a union field representative that the violence would cease. Less than a month later, however, violence flared up again, and after another hearing, at which oral testimony was taken, the judge issued the order. None of the defendants before me, including Local 25, have given this Court any clear assurance that the violent picketing that has occurred will not be resumed.

The labor dispute is still unresolved and the defendants are still on strike. The intensity of the feeling that exists on the part of the defendants toward the plaintiff is manifest from the nature, extent and duration of the violence which has characterized the picketing by the defendants thus far.

I find it probable that unless restrained by this Court there will be a resumption of substantially the same kind of violent activity on the part of the defendants as they engaged in up to the commencement of this action.

### Conclusions of Law

1. The Court has jurisdiction to grant the injunctive relief sought by the plaintiff against the defendants. 29 U.S.C. §§ 101 and 107.

2. Unlawful acts have been committed by the defendants and will be continued unless restrained.

3. Substantial and irreparable injury to plaintiff's property will follow.

4. As to each item of relief granted, greater injury will be inflicted upon the plaintiff by the denial of relief than will be

inflicted upon defendants by the granting of relief. I find that the granting of the relief sought will inflict no damage upon the defendants.

■ 5. Where a temporary restraining order is issued after due notice and hearing, the statute, 29 U.S.C. § 107(e), does not require a showing that the injury to plaintiff's property "will be unavoidable" as is contended by defendants Local 25 et al. in their supplemental brief. Only the likelihood of such injury need be shown.

■ 6. The sole function of injunctive relief, whether temporary or permanent, is to forestall future violations. *United States v. Oregon Medical Society*, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

The Supreme Court has said, "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit . . . ." *United States v. Oregon Medical Society, supra*, at 333, 72 S.Ct. at 696. In this case the defendants' cessation of their illegal activity was brought about by the filing of the plaintiff's complaint.

7. Public officers charged with the duty to protect plaintiff's property are unable to furnish adequate protection because of the large number of men engaged in the picketing and the numerous, violent and unlawful acts of the pickets while so engaged.

8. Plaintiff has not failed to comply with any obligation imposed by law which is involved in the labor dispute in question, nor has the plaintiff failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery.

9. Plaintiff has no adequate remedy at law.

The plaintiff's motion for a temporary restraining order is granted except as to defendant Robert L. Smith, upon whom service was not made.

An appropriate temporary restraining order will be filed with this opinion.

## TEMPORARY RESTRAINING ORDER

This action came on to be heard upon plaintiff's motion for a temporary restraining order, pursuant to Section 7 of the Norris-LaGuardia Act (29 U.S.C. § 107) and Rule 65 of the Federal Rules of Civil Procedure, restraining the defendants from engaging in unlawful acts in the course of the picketing at the operating center of United Parcel Service, Inc., the plaintiff in this case, situated at Arlington Street and Coolidge Avenue in Watertown, Massachusetts.

The Court, after due personal notice to the defendants, and after hearing them or granting them an opportunity to be heard, and upon consideration of the pleadings, the evidence, and written arguments of counsel, has made the findings of fact and conclusions of law set forth in its "Opinion and Ruling on Plaintiff's Motion for a Temporary Restraining Order," filed herewith, and granted the plaintiff's motion.

Now, therefore, it is

ORDERED, ADJUDGED and DECREED that pending the determination of plaintiff's motion for a temporary injunction, the defendant Local 25 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and William J. McCarthy in his capacity as president and principal executive officer of said Local 25, and Daniel Halloran, individually and in his capacity as an officer of said Local 25, and Andrew Merola, John Trinidad, George Beals, William Belding, Salvatore Calcagno, John Coletta, Louis Coviello, James Curtin, John Evans, William Fitzpatrick, Francis P. Kelly, Gary Kenney, William Maguire, Robert Mitza, James O'Leary, Joseph Scolponeti, James Splaine and Peter Talas, individually and as members of said Local 25, be and they are hereby enjoined and restrained from doing, whether singly or in concert, any of the following acts:

1. Obstructing, impeding or otherwise hindering plaintiff's customers or employees or any other person from entering or leaving at will the plaintiff's center.

2. Engaging in mass picketing activity at plaintiff's center calculated to intimidate, coerce, obstruct, or assault any customer or employee of the plaintiff, or any other person having business on plaintiff's premises.

3. Interfering or attempting to interfere with the delivery of parcels, packages or other goods by the plaintiff to its customers.

4. Molesting or interfering or attempting to interfere with customers who go to plaintiff's center to receive and carry away parcels, packages or other goods.

5. Committing or threatening to commit any act of violence against plaintiff's property, customers or employees at or away from plaintiff's center.

6. Committing or threatening to commit any act of violence against members of plaintiff's employees' families.

7. Using at one time more than five pickets at gate 4 or more than five pickets at any other gate that may be kept open by the plaintiff at its center for use by foot or vehicular traffic.

8. Causing any other person to do any of the foregoing acts.

Wherever in this Order the words plaintiff's center or premises are used, they shall mean plaintiff's operating center at Watertown, Massachusetts.

Nothing in this Order shall be construed as enjoining or restraining any of the defendants from doing, whether singly or in concert, any of the acts specified in Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104.

This Order shall not be issued except on condition that the plaintiff shall first file an undertaking with adequate security in the amount of $2,000 for the purposes and upon the terms specified in 29 U.S.C. § 107.

It is FURTHER ORDERED that the plaintiff shall cause personal service upon all the defendants to be made forthwith of a copy of this Order together with a copy of the Court's Opinion and Ruling on Plaintiff's Motion filed herewith.