Nazareth GATES et al., Plaintiffs,

United States of America, Plaintiff-Intervenor,

v.

John COLLIER et al., Defendants.

No. GC 71–6–K.

United States District Court, N. D. Mississippi, Greenville Division.

May 17, 1978.

---

See also, D.C., 454 F.Supp. 579.

Ronald R. Welch, Jackson, Miss., Shawn Moore, Dept. of Justice, Washington, D. C., for plaintiffs.

P. Roger Googe, Jr., W. W. Westbrook, IV, Asst. Attys. Gen., Jackson, Miss., Pascol Townsend, Drew, Miss., for defendants.

MEMORANDUM OPINION

KEADY, Chief Judge.

On February 27, 1978, the United States, as plaintiff-intervenor, filed a motion in this cause for supplemental relief seeking the immediate closing of Camps 1 and 2 as inmate housing units at the Mississippi State Penitentiary [1] and the appointment of an environmentalist and/or special master to oversee the institution's health, safety and maintenance programs. Plaintiff-inmates, through their separate counsel, joined in the government's motion, and also sought the establishment of a timetable for the closing of five additional housing units, Front Camp, Camp 3, Camp 4 (formerly First Offenders Camp), Camp 7 and Maximum Security Unit (MSU) within one year.

The court on March 14 and 15 conducted an evidentiary hearing, at which time the government offered Theodore Gordon, environmental and hygiene specialist of Washington, D. C., and a series of photographs secured by an FBI agent of certain inmate camps, including Camps 1 and 2, as well as Camps 3, 4, 7 and MSU. Plaintiff-inmates offered testimony by present and former inmates who reside or had formerly resided at Camps 1 and 2. Defendant prison officials presented testimony from Paul Rankin, Director, Division of Foods and Sanita-

tion of Mississippi State Board of Health, Morris Phillips, Chief Inspector of the Mississippi State Building Commission, J. R. Crutcher, Chief Deputy of Mississippi's State Fire Marshal's office, Steve Hargett, prison warden, and John Watkins, Commissioner of Corrections. In addition, the defendant officials offered photographs of recent date depicting the condition of Camps 1 and 2 shortly prior to date of hearing. Evidence on other issues not directly related to the question of closing of Camps 1 and 2 and the adequacy of minimum standards for environmental health and hygiene, and hence not pertinent to the present issues, need not be discussed herein.

At the conclusion of the evidentiary hearing which presented serious factual disputes, the court announced that prior to making its ruling it would await the adjournment of the 1978 Session of the Mississippi Legislature scheduled to take place within the next ten days to ascertain what, if any, pertinent measures might be enacted, and also that the court would take the opportunity to make a personal tour of Camps 1 and 2 to gain assistance in resolving the serious issues raised by evidence adduced at this hearing. The Legislature did adjourn after adopting certain significant legislation,[2] and the court made its

---

1. In earlier orders, this court has heretofore ordered the closing of 8 inmate camps, designated as Camps B, 4, 5, 6, 8, 9, 10–B and 11, and placed a ceiling on the inmate population from and after January 1, 1977, based upon a formula of 50 square feet of living space per inmate.

2. The 1978 legislation deemed to be of major significance was the passage of the following laws:

(a) House Bill No. 891 amending Miss. Code Ann. § 47–5–113 (1972), inserting new § 2 thereof, which reads as follows:

The State Building Commission and the State Board of Health are hereby authorized and directed, upon the passage of this act, to institute permanent quarterly structural and environmental inspections of institutional housing and service facilities at the State Penitentiary, such inspections to include but not be limited to, structural soundness, repairs and maintenance of buildings; food service; fire and safety hazards; fresh water supply; waste water system; sewage collec-

tion and treatment; solid waste collection, storage and disposal; rodent and pest control and general institutional housekeeping.

All other state agencies, authorities, boards, commissions and departments are hereby directed, upon the request of the Commissioner of Corrections, the State Building Commission or the State Board of Health, to assist in such inspections with the fullest degree of reasonable cooperation.

Within thirty (30) days of the completion of the inspections provided for herein, the participants shall compile a written report of their findings which shall be submitted to the Governor, the Commissioner of Corrections and the Warden of the State Penitentiary.

(b) Senate Bill 2417, authorizing the State Building Commission to lease penitentiary lands in Quitman and Sunflower Counties upon competitive bidding, with all lease monies not exceeding $500,000 in any fiscal year derived therefrom to be placed in a special fund in the State Treasury, to be known as the "Prison Industries Fund," to be appropriated by the Legislature to operate the prison industries.

tour of Camps 1 and 2, as well as other facilities, on April 30.

### Contentions of the Parties.

The government contends that Camps 1 and 2 should be immediately closed, citing the 1972 findings of this court that the old dormitory facilities at "the great majority of the camps are in severe need of maintenance and repair, if not replacement, because the present conditions are hazardous to the health and safety of human beings." *Gates v. Collier,* 349 F.Supp. 881, 888 (N.D. Miss.1972), aff'd 501 F.2d 1291 (5 Cir. 1974); that the timetable heretofore established for closing the most dilapidated camps did not include, but should have included, Camps 1 and 2. Government counsel further assert that instead of making essential expenditures to maintain the camps in line with minimum standards of human habitation, continued neglect in maintenance and housekeeping has greatly accentuated environmental deficiencies in the two camps under consideration as well as all other camps inspected by Gordon, the government's environmental expert. The government urges that in keeping with this court's prior holding, *Gates v. Collier,* 423 F.Supp. 732 (N.D.Miss.1976), that "the lack of minimum standards of environmental health service and a uniform maintenance program contribute greatly to the breeding of unsanitary, indecent and intolerable conditions of unhealthiness, which are of constitutional significance."[3] Thus, the government submits that the continuing lack of essential environmental health service, housekeeping and maintenance programs not only impairs Camps 1 and 2, but adversely affects all other housing facilities, including Parchman's newly constructed units, and mandates the appointment of an environmentalist or special master to over-

see a proper health, safety and maintenance program for all inmate housing units. Plaintiff-inmates adopt the positions taken by the United States; in addition thereto they seek the immediate closing of other camps (3, 4, 7 and MSU) which the court ruled out as not ripe for determination at this time. Defendants' contention may be briefly stated that Camps 1 and 2 should not be immediately closed, and that whatever prior deficiencies may have heretofore existed in the programs of housekeeping, maintenance and environmental concerns, all necessary steps have been taken to correct these deleterious conditions. Defendants finally urge that in no event should Camps 1 and 2 be closed prior to July 1980, because they assert that by that date an aggregate of 1940 additional bed spaces for inmates will be provided, taking into account construction of units soon to be completed, construction of additional units for which bids are about to be taken, and also construction of units for which the Legislature at its 1978 Session has appropriated ample funds.

### I. FACTS

(a) The state of environmental factors at all Parchman habitation facilities including adequacy of housekeeping and maintenance programs, which especial emphasis on Camps 1 and 2.

The above issue, not restricted to Camps 1 and 2, must be viewed in the most serious terms. Gordon, a highly qualified environmental specialist, has testified in this court at several hearings, August 7, 1975, October 4, 1976, and at the current hearing following his December 1977 inspection as to the continuing presence of many detrimental environmental conditions prevailing at most camps, which he attributed primarily to the

---

(c) House Bill No. 1011, known as the "Penitentiary-Made Goods Act of 1978," authorizing the State Department of Corrections to utilize from funds appropriated into the Prison Industries Fund to establish vocational training, trades and occupations by inmates with a view to their rehabilitation and to utilize inmate labor for self-maintenance and reimburse state-incurred expenses for incarceration.

(d) House Bill 1461 providing appropriation of $4,000,000 for the construction and equipment of a medium security unit for 500 inmates.

**3.** By the time of this holding, the court had ordered the closing of the eight housing units mentioned in n. 1.

lack of acceptable housekeeping, maintenance, and public health programs. We hold that in December 1977 Gordon found that many housing units, including some newly constructed, were being poorly maintained, and utterly failed to satisfy minimum standards of good service sanitation required by the Mississippi State Board of Health, and other minimum standards applicable to penal institutions. Moreover, the conditions of cleanliness and health varied widely from camp to camp, indicative of absence of coordinated programs. These conditions Gordon discussed with Mr. Regan, Director of Engineering, who admitted that he did not have a preventive maintenance program, that the greatest complaint by him to Warden Hargett was having to employ unqualified persons to assume the responsibilities of maintenance in critical areas such as refrigeration, heating, food service sanitation, sewage system, etc. We emphatically agree with Gordon's conclusion that Parchman's buildings, whether old or new, are in dire need of being constantly surveyed and kept under scrutiny by environmental specialists able to identify priorities for public health needs and having competent personnel to achieve compliance with minimum standards of public health and safety applicable to penal institutions.

Gordon's testimony was but a refrain of what this court has often heard in prior hearings, from T. Wade Markley, retired federal correctional official, who served for a period of time under this court's order to monitor the Parchman operation, and other correction officials who have, almost without exception, classified Parchman as one of the dirtiest, most ill-kept penitentiaries ever viewed by them—a state of degradation distinctly separate and apart from the age, structural weaknesses and inadequacies of old dormitory buildings. This court has no hesitation in reaffirming that under previous superintendents who preceded Warden Hargett, serious, consistent and coordinated efforts at Parchman were not made or adhered to to insure that the habitation units were placed and maintained in a state of

acceptable cleanliness and safety from environmental, public health and safety standpoints. At the conclusion of the March 15 hearing, this court so stated its views orally from the bench, although expressly without adjudicatory effect, but voicing an opinion that it generally took a federal court hearing to clean up a vital state institution for incarcerating felony offenders. We are constrained to believe that those views so expressed, perhaps, had influence upon the passage of House Bill 891, which, by state law, for the first time, mandates permanent quarterly structural and environmental inspections of institutional housing and service facilities at the state penitentiary (see n. 2, supra).

(b) Fire safety and public health hazards.

Between the time of Gordon's last inspection in December and the filing of the government's present motion for supplemental relief, the prison officials began to take definite affirmative action along environmental lines. The first step taken by prison officials was to request J. R. Crutcher, Chief Deputy State Fire Marshal, to inspect the prison facilities, particularly Camps 1 and 2. As a result, such inspections were carried out on four occasions in January and March 1978.[4] By January 1978, Crutcher found some improvements regarding fire hazards noted on his prior inspection, and he evinced a willingness to inspect the prison, where standards for fire protection are, admittedly, more strict than elsewhere, by proposing to make quarterly inspections in the future, giving such inspections priority attention of his office. After visiting all camps, Crutcher called for development of a fire evacuation plan, for fire exit signs to be mounted in permanent positions and exit routes posted in each of the dormitory facilities. He also recommended that fire extinguishers be mounted not more than 75 feet apart, which had been accomplished by the time of the March hearing; that polyurethane, or rubber foam mattresses, of high flammability, found at

4. The first inspection the State Fire Marshal ever made of the Parchman facilities was in 1976 in response to the request of this court. He made a second inspection in 1977.

many camps, be replaced with cotton mattresses, and that fire drills be instituted. In fact, Crutcher had one such drill, under Sergeant Jones at Camp 4, which housed 151 inmates, carried out and determined that it took eleven minutes to accomplish evacuation of the unit which, in an emergency situation, should have been concluded in no more than one minute.

Paul Rankin, of the State Board of Health, has in past years made irregular inspections of the penitentiary. In January 1978 he essentially confirmed the testimony of Gordon that at Camp 1, for example, there was evidence of rodent infestation in the kitchen, mold growth in the shower and toilet areas, exposed electrical wiring; and at Camp 2 he found similar evidence of rodent infestation, commingling of food and non-food items, mold accumulation in toilet and shower areas, dirty refrigerating equipment, and other health hazards which he brought to the attention of the prison staff. By March 3 and March 13, 1978, Rankin reinspected Camps 1 and 2, testifying that he found all environmental deficiencies had been corrected in both housing units, and that virtually all of Gordon's adverse December 1977 findings had been eliminated. Rankin and his staff agreed, should the prison officials so request, to make future quarterly inspections of the public health conditions at all of the Parchman facilities, not restricted to Camps 1 and 2. On cross-examination, it was brought out that Rankin had inspected all of the older camps beginning in 1974 once a year and recommended correction of deficiencies which went unattended. He acknowledged that the State Health Department has never used enforcement powers against the penitentiary, but he was quite willing from and after the March hearing to make quarterly inspections of public health conditions and submit his reports to the warden.

(c) Housekeeping and Building Maintenance Programs.

■ Steve Hargett testified that after becoming warden on September 23, 1977, he reorganized the sanitation and maintenance departments, adopting a work program involving 60 free-world sanitation employees assisted by 30 inmates, and 17 free-world maintenance personnel and 50 inmates; that he had acquired additional equipment such as a bulldozer and pickup trucks for use in landscaping, for fill and correcting drainage problems. He testified that in early 1978 he obtained a $150,000 CETA grant to increase his staff in different areas, including maintenance and food service. As previously brought out, Hargett sought inspections and advice from the State Board of Health and the State Fire Marshal's office; these requests were initiated after Gordon's December visit. Hargett and his staff, on January 6, 1978 (Deft.Ex. 16), issued orders to all sergeants and staff, entitled "Housekeeping, In-house and Repairs at all Camps," with a follow-up order to the same sergeant and staff at Camp 1 on January 10, again requesting compliance in correcting deficiencies by Wednesday, January 18 (Deft.Ex. 17); on March 9 the warden issued additional housekeeping and repair orders to all camps (Deft.Ex. 18), directing that compliance therewith be accomplished not later than Monday, March 13,[5] giving specific and de-

5. Counsel for defense, in their post-trial memorandum, undertook to "bootstrap" their defense by including Hargett's affidavit that he and Col. Mailly on April 5, 6 and 7 conferred at Washington, D. C. with officials of the Federal Bureau of Prisons, Department of Justice and American Correctional Association; that he met with various staff members of the Federal Bureau of Prisons, having conferences about, inter alia, institutional preventive maintenance programs and fire prevention, health and safety programs; that he also met with officials of the American Correctional Association and received copies of their "Manual of Standards for Adult Correctional Institutions;" that upon his return to Parchman on April 7, Hargett called a staff meeting, distributed the manual and other materials he had obtained regarding, among other things, penitentiary maintenance, food service, etc., and instructed his staff to read the material. Also, Hargett's affidavit affirmed that he intends to order the preparation of a Policies and Procedures manual similar to that in use by the U. S. Bureau of Prisons for each functional area of the Parchman penitentiary, that he has issued orders to the penitentiary maintenance staff to enroll in maintenance workshops planned and scheduled over the next few months by the Mississippi State Building Commission, and he proposes, in the near future, to send the penitentiary fire and safety officer, the food service director, and

tailed directives for the maintenance, repair, cleanliness, food handling and service and other aspects of a healthy environment for inmate housing (Ex. 16). By this last order, prison personnel at all camps were directed to make personal inspection of conditions, sign, and return copy of their findings to the warden's office.

Warden Hargett further testified that in the future he will seek aid from the State Building Commission, which has in its employ environmental specialists and mechanical engineering experts, and would immediately put into effect the food service program prescribed for the prison by Paul Rankin of the State Board of Health.

To evaluate the physical, or structural, conditions of Camps 1 and 2, certain background evidence, adduced at prior hearings, should first be set forth. Upon the court's first request in 1975, defendant officials submitted a preliminary report on all inmate housing units prepared by Brewer, Godbold & Associates, architects and engineers of Clarksdale, Mississippi. This report, dated February 27, 1975, expressed the opinion that the old residential camps, despite contrary statements made by others, "could be made habitable on a limited term basis by repair and rehabilitation. The continued high level of inmate population could force the State to bring part or all of the old facilities into an acceptable condition. It goes without saying that some units would require more repair than others."

Specifically addressing Camp 1, the 1975 Brewer report stated its conclusion, that due to its location, use, and condition, Camp 1 would warrant "rehabilitation as temporary housing.[6]

As for Camp 2, a similar opinion was expressed.[7]

In November 1976, at the request of the State Department of Corrections, a structural report known as the Rosser Report, prepared by an expert engineering firm at Atlanta, Georgia, presented a survey of all inmate housing units. In its Executive Summary, this Report classified Camps 1 and 2 "ORIGINAL PLANTATION CAMP BUILDINGS—These combination masonry/wood frame facilities are not feasible for long-term renovations because of configuration and fire protection requirements. Renovations for short-term temporary use are possible; however, the facilities will not comply with fire protection requirements." Rosser then flatly stated: "Camps 1 and 2 should be closed at the earliest time that replacement facilities can be completed." (p. 2). The Rosser Report after making certain generalizations regarding lack of

---

other personnel of Parchman's staff to various training courses conducted by the National Safety Council. Defense counsel also attached to their brief a memorandum from Hargett dated April 17 relating to a summary of camp inspections carried out by the most recent inspection of March 30, 31 by the State Fire Marshal and State Board of Health, giving a breakdown of each camp's needs in regard to maintenance, housekeeping, sanitation and fire safety, and advising immediate correction of all areas possible with available materials and supplies and directing that attention be given to uncompleted needs. This post-trial material, unilaterally submitted by defense counsel, is, of course, without evidentiary effect; and while the belated efforts of prison officials to achieve an acceptable environmental level in the various areas of public health, safety and building maintenance are quite laudable, this data highlights the dereliction of Mississippi's prison officials for not having taken such obvious remedial steps a long time ago.

6. Brewer's report on Camp 1 was as follows: Floors are bare concrete needing resurfacing with underlayment and finishing with high grade resilient tile. Kitchen floors need resurfacing with quarry tile. The roof structure is in fair condition except at porch. Porch columns are bent and broken and some are missing. There are numerous roof leaks. Some ceilings are fiber tile acoustic ceiling with one cage having corrugated metal ceiling. Recently reworked and extended baths have ceramic tile floors and wainscot. Masonry walls, although generally in good condition, need pointing. This building due to location, use and condition would warrant rehabilitation as *temporary housing*. (Emphasis added).

7. This camp has a recently installed shingle roof and no roof leaks are apparent. This building appears to have good roof framing. The bare concrete floors are typical. The ceilings, except at baths, are wood beaded ceilings. Washrooms and toilets have quarry tile floors and some ceramic tile walls and some plaster walls. The kitchen is typical and needs a great deal of attention. Due to use, location, and general condition, this camp would appear to merit rehabilitation as *temporary housing*. (Emphasis added).

maintenance, supportive of our prior findings in that regard,[8] proceeded to make specific evaluations for continued use of Camps 1 and 2. These evaluations for continued use and health, fire and safety violations are set out below.[9]

8. Many deficiencies found during this assessment can be directly linked to improper installation, inadequate or no preventive maintenance, unspecified or uncontrolled operating procedure, and/or insufficient supervision of spaces. New temporary facilities, after less than 2 years' use, graphically illustrate this point by their already somewhat deteriorated conditions. Inoperative safety devices, exposed wiring terminals, waste-potable water cross-connections, and open sanitary pits and manholes are but a few examples of conditions that must be corrected immediately to reduce hazards.

An immediate priority should be the development of operational preventive and routine maintenance procedures. Complete emergency procedures for fire, security and other potential disaster conditions should also be devised and implemented immediately.

The widespread installation of L.P. and natural gas systems throughout the complex requires extensive modifications to meet requirements of the Southern Standard Gas Code. Open-flame gas heating devices in housing units were often found to be unvented, a serious threat to life, and many L.P. storage/distribution systems pose potential hazards in a correctional setting by virtue of their accessibility.

Waste and potable water systems throughout the complex exhibit deficiencies in maintenance, operational procedures, and frequently in operational capacities. Significant improvements are required to meet requirements of the Environmental Protection Agency regarding levels of contaminants present in discharged effluents. Instances were also found in which contamination of potable water supplies occurred or could occur. Because many questions beyond the scope of this inventory/assessment were raised, further in-depth study and testing are recommended to ascertain the extent of contamination and to specifically outline corrective measures. (Rosser Report, p. 3).

9. Camp 1:
EVALUATION FOR CONTINUED USE
Building roof structure requires extensive repair.
Replacement of roofing is required.
Floors in dining area require concrete cap and finishing with sealant.
All toilet rooms require new tiled floors and wall surfaces.
Entire ceiling system requires replacement with type suitable for prison application.
Dormitory lighting requires replacement to deliver 30 foot candles lighting level.
Dormitory electrical system requires renovation to provide adequate convenience outlets.

One mop sink and one laundry sink required in each dormitory toilet area plus one water closet in left dormitory.
Regrading is required for adequate storm drainage at building.
Site landscaping with grass and shrubs is required for erosion control.
Can wash with hot/cold water and power drain to waste water system is required near kitchen.
HEALTH, FIRE AND SAFETY VIOLATIONS
Open-flame gas heating system not vented.
Water heater improperly vented.
No pressure-relief valve on water heater.
Unacceptable electrical surface extensions.
Exposed electrical terminals at outlet boxes, equipment, panelboards.
Potable and waste water systems cross-connected.
Kitchen waste discharge to open ditch.
Open sewage system in activity yard.
Fire exit plan not posted; exit routes unmarked.
Inadequate toilet room ventilation.
Camp 2:
EVALUATION FOR CONTINUED USE
Building roof structure requires extensive repair.
Replacement of roofing is required.
Floors in dining areas require concrete cap and finishing with sealant.
All toilet rooms require new tiled floors and wall surfaces.
Entire ceiling system requires repair.
Dormitory lighting requires replacement to deliver 30 foot candle lighting level.
Dormitory electrical system requires renovation to provide adequate convenience outlets.
One mop sink and one laundry sink required in each dormitory toilet area.
Regrading is required for adequate storm drainage at building.
Site landscaping with grass and shrubs is required for erosion control.
Can wash with hot/cold water and proper drain to waste water system is required near kitchen.
HEALTH, FIRE AND SAFETY VIOLATIONS
Open-flame gas heating system not vented.
Water heater improperly vented.
No pressure-relief valve on water heater.
Unacceptable electrical surface extensions.
Exposed electrical terminals at outlet boxes, equipment, panelboards.
Potable and waste water systems cross-connected.
Kitchen waste discharge to open ditch.
Sewage open on grade.
Inadequate fire exits.
Fire exit plan not posted; exit routes unmarked.
Inadequate toilet room ventilation.

Morris P. Phillips, Chief Inspector for the Mississippi State Building Commission, testified that he has made periodic inspections of various housing units, including Camps 1 and 2, with his most recent inspection of those two particular camps carried out in January 1978 and in March, on the eve of the federal court hearing. Regarding Camp 1, he stated that a new roof was installed last winter; floors were capped with concrete and finished with sealant in the kitchen but not in the dining areas; all toilet rooms have new tile floors and wall surfaces which need further repair; dormitory lighting adequate to deliver a 30 foot candle lighting level prevails; the dormitory electrical system has been adequately renovated; and a mop sink and laundry sink have been installed in each dormitory toilet area, plus a water closet in the left dormitory. Phillips stated, however, that a can wash with hot/cold water and proper drain to waste water system had not been installed, nor had necessary erosion control been effected. According to Phillips, virtually all health, fire and safety violations noted in the Rosser Report, had been corrected, with the notable exception of kitchen waste discharge into open ditches.

With respect to Camp 2, Phillips' testimony was to the effect that a new roof had been installed a year ago; dining room floors had been recently painted; flooring had been repaired only in the kitchen area; new tile floors and wall surfaces had been installed in the toilet rooms; repairs had been made to portions of the ceiling system; ample lighting at 30 foot candle level had been achieved, and ample electrical outlets had been installed; a mop sink and a laundry sink were installed in each dormitory toilet area; and regrading accomplished for adequate storm drainage. Phillips conceded that neither landscaping for erosion control nor can wash with hot/cold water and proper drain to waste water system near kitchen had been corrected. He again expressed the view that virtually all health, fire and safety violations noted in the Rosser Report had been corrected.

 Exclusive of maintenance, the facts are the actual dollar expenditures for building repairs for the period November 1976–March 1978 on these two camps—for which Rosser made no recommendation whatever as to monetary outlay—has been

Camp 1 $13,457

Camp 2 10,681 (Court's Ex. 1)[10]

Phillips brought out, however, that Ken Greenwald and Robert Burke, recently employed by the Mississippi State Building Commission, were competent environmental and engineering specialists, fully qualified to establish acceptable preventive maintenance and environmental programs, as Greenwald was the environmentalist with electrical specialty, and Burke the expert in mechanical engineering operations. Phillips affirmed that these specialists should be made available to the Parchman facility.

(d) New housing units under construction and contemplated; consequences of court-imposed limitation of inmate population based upon standard of 50 square feet of living space per inmate.

Commissioner Watkins testified about increased inmate bed capacity under way at the penitentiary. He stated that two 192-

---

**10.** The cost of maintenance for each of the camps during the 17-month period of $95,708 was arrived at by taking the entire maintenance cost of 17 inmate camps, dividing it by 17 and multiplying that figure by 17 monthds covering the period in question. Thus, this computation assigns arbitrarily the same maintenance cost to each of the 17 camps, irrespective of what the maintenance needs of any camp might be, especially Camps 1 and 2. We can give small credence to this type of computation since it ignores the obvious fact that the maintenance needs of the old dormitory camps necessarily are substantially greater than may be the case with the newly constructed units.

We likewise give small weight to the report of L. D. Godbold dated March 21, 1978, which was inconsistent with his 1975 report "concluding that Camp 1 is structurally safe for another 25 years and Camp 2 for another 10 to 15 years;" Godbold did not appear as a witness at the trial, was not subject to cross-examination and his report obviously was based upon mere visual inspection without the benefit of any sub-surface or load test and is at complete variance with the Rosser Report. Indeed, when objection was made to the report tendered without Godbold being subject to examination, the court should have excluded it from consideration, as it now does.

man medium security units, which had been scheduled for completion by January 1, 1978, should be completed during the months of June and July 1978; the Legislature, at its 1977 Session, had appropriated $3,500,000 for the construction of three units, one a 68-man close custody unit, one a 144-man medium security unit, and one a 344-man minimum security unit, for a total capacity of 556 beds; that the State Building Commission is expected to receive bids during May 1978—ten months after appropriations became available July 1, 1977—for the construction of the 556-man units with completion of such construction contracts, yet to be awarded, hopefully by October 1, 1979. The Commissioner further brought out that additional funds were being sought at the current Session of the Legislature for a self-contained medium type unit housing 500 inmates at a cost of $4,000,000; these funds were, in fact, appropriated by the 1978 Legislature (see n. 2(d)). Watkins expressed hope that the construction of this unit could be achieved by July 1980. In other words, according to Commissioner Watkins, if all goes well, 1440 additional bed spaces would become available by July 1980, in addition to current substantial appropriations made for the installation of restitution centers in different areas of the state.

During the course of this testimony, it was brought out by Commissioner Watkins that 698 felons are presently being confined in jails throughout the state and that it could be reasonably expected that the number of felony offenders requiring incarceration will increase, despite the state's utilization of parole, work release at satellite centers and in the private sector, and the development of restitution centers in addition to the single such facility presently existing in Jackson County.[11]

11. It should be noted, in passing, that the Commissioner stated that construction of a new medical-dental facility, containing 56 beds—a constitutional deficiency long decried by this court—has been under construction since last December, with completion anticipated in

## II. LAW

(a) *Constitutional necessity for achieving decent environment for prison inmates.*

The court, on its tour, primarily of Camps 1 and 2, but extending to certain new inmate facilities as well as MSU, noted definite improvement in the cleanliness and housekeeping conditions of the inmate living quarters, shower and toilet areas, better handling of storage of food and non-food items, and better refrigeration capacity. To that extent, Warden Hargett's dedication to a clean prison is beginning to show positive result, unless the cynical conclusion might be drawn that Parchman was cleaned up only for "a federal judge's inspection" —a judgment which we do not choose to make. Nevertheless, we deem it appropriate to issue orders to insure that Parchman will never again revert to an unconstitutional status of squalor, filth and degradation, attributable to recurring or repetitive neglect of achieving acceptable preventive maintenance, public health and safety programs, and to make certain that a sanitary environment is maintained for inmates confined at Parchman. Expressed good intentions alone, even though the professional leadership at Parchman appears to be attaining new standards of excellence, fail at this stage of this litigation—an elapse of nearly five years after our original findings of intolerable neglect of housing in which human beings, though convicted felons, were required by Mississippi to survive during the periods of their incarceration.

■ Given all of the circumstances of this case, we are firmly of the opinion that the "threat of continued or resumed violations of . . . federally protected rights [of prison inmates living in a decent environment] remains actual. Denial of injunctive relief might leave [prison officials] 'free to return to [the] old ways.'" *United*

March 1979. The Commissioner further stated that the current session of the Legislature has seen fit to grant all appropriations for additional personnel requested by the Department of Corrections.

*States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment [of violation of constitutionally protected right] seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952). As stated in *Grant,* concomitant with a court's jurisdiction, its power to hear a controversy is the power to grant injunctive relief which may survive the discontinuance of illegal, constitutionally impermissible conduct, wherever it is clear, on the total record, that such danger may be reasonably found to exist. These familiar principles of equity jurisprudence were applied by the Fifth Circuit in *Bailey v. Patterson,* 323 F.2d 201 (1963), *cert. denied,* 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609. They, in our opinion, fit this case like a glove.

██ Preliminarily, we must dispose of certain untenable arguments advanced by both government counsel and counsel for plaintiff-inmates before reaching the proper disposition of assuring a permanent healthy environment at Parchman. The government would suggest that an ombudsman or special master to monitor the environmental standards at the penitentiary be appointed by the court. That suggestion is wholly impracticable for the reason that the Department of Justice, in response to the court's inquiry, has advised that it cannot secure funds from any federal source to obtain the services of a properly qualified expert with requisite specialties who would have allegiance only to this court. Similarly, counsel for the plaintiff-inmates are no less impractical; they make an alternative request, i. e., that one or both of the United States Magistrates of this federal Judicial District assume the task of monitoring Parchman, or else that Honorable Elbert P.

Tuttle of the Fifth Circuit Court of Appeals, now in senior status, familiar with all previous rulings in this case, be requested to assume the role. As for the use of our magistrates, their training is in the law, and not in environmental health and safety standards and, conscientious public servants though they be, they are without expertise in the areas needing critical attention. Additionally, they are burdened with assisting the two district judges within the Northern District of Mississippi having caseloads of more than 800 pending civil suits, in addition to handling of an ongoing federal criminal docket. Necessarily, magistrates could contribute little of a significant nature to a monitoring program. As for Circuit Judge Tuttle, we believe he would, most likely, also be in essentially the same position, apart from the obvious fact that it would be highly inappropriate, indeed quite unprecedented, for a trial judge to make a request of this nature from an appellate judge, who, in all probability, will continue to review the correctness of our rulings concerning the Mississippi State Penitentiary. We are therefore left without the benefit of helpful suggestions from counsel as to remedy, and turn to what we believe to be the only reasonable, but necessary, requirement clearly emerging from the substantial evidence of this case, taking into account the entire record made since our entrance into this litigation in 1971.

█ We are satisfied, beyond any reasonable doubt, that a permanent injunctive order, couched in explicit terms to assure the commitment of the state's resources to plan, program, monitor, implement and achieve acceptable environmental, public health and safety standards, will bring, without further delay, the penitentiary into full compliance with the Constitution insofar as environmental standards concerning institutional maintenance, cleanliness, food handling services, public health, safety, and other aspects of a decent environment.[12]

12. Additional parties, if necessary, such as Mississippi State Building Commission, Director of the State Public Health Department, State Fire Marshal, and other state agencies will be added as defendants to establish these imperative goals which *now,* under state law, exist as a priority item because of the passage of House Bill No. 891 (n. 2(a)). Should these state agencies fail to provide adequate resources to cope with the problems, the court retains its constitutional power, authority and responsibility to order the closing of additional camps.

An appropriate order carrying out the mandate of this court will issue forthwith consistent with the views herein expressed, but in such terms as to leave no one in doubt as to its meaning, scope and duration, as well as the consequences of noncompliance.

(b) *Closing Camps 1 and 2.*

■ We next address the remaining issue of closing Camps 1 and 2, which the government and plaintiff-inmates urged be accomplished immediately, while the prison officials contend that both camps should remain available for inmate housing for at least two years more, or until July 1980, upon the assumption that by that date additional bed spaces for inmates will, hopefully, have been provided to adequately take care of the inmate population, thereby relieving the backup of convicted felons being held in the county jails throughout the state, pending space for them at Parchman. We find both suggestions unacceptable and not in accordance with reason and the credible substantial evidence. Apart from the Godbold report of March 21, 1978, which is in utter conflict with all previous structural inspections of Camps 1 and 2, it is manifestly clear that these camps, even though their level of maintenance has somewhat improved, and new roof shingles and certain cosmetic repairs (see Court's Ex. 1) have been done, have no more than very limited further use as temporary housing. A prominent fact contained in the Rosser Report, the most reliable study ever made of housing with evaluation from structural standpoint, is that no recommendation was advanced for making expenditures for basic building repairs; the State has, indeed, made very little, if any, structural repair during the 17-month period since the Rosser Report was submitted to the Department of Corrections. Careful analysis of Phillips' testimony as to the highly restrictive nature of the work done at these camps must be placed in proper focus, i. e., that both camps have had only minimal repairs, involving modest expenditures. Likewise, we are un-

persuaded by the opinion of Rankin, admittedly without expertise in structural conditions, that Camps 1 and 2 could be continued, for an indefinite period of time, for human habitation; his opinions do not form a substantial basis for acceptable answers as to how much longer Camps 1 and 2 should be used. The overwhelming substantial evidence is both Camps 1, housing 139 inmates, and 2, housing 103 inmates, are aged buildings which cannot be effectively maintained; and most, if not all, of their windows are wood rotted beyond repair, making it impossible to seal windows and doors against excessive air and water infiltration; that beneath the newly applied shingles lay infirm wooden superstructures, with large attics, wholly incapable of repair, so dilapidated that the new roof repair cannot prevent leaks at the corners of these ancient buildings; old concrete floors are porous, cracked and cannot be effectively maintained; inadequate ventilation prevails in living spaces, and shower and toilet areas. Despite improved heating, and some improvement in lighting and in the condition of the floors of toilet areas, as well as recent improvement in overall maintenance, both camps should not be allowed to house inmates for another winter. We have considered trying to evaluate one camp as suitable for longer use than the other, and concluded from evaluation of the evidence that we cannot justify drawing a distinction for such purpose. This court is very mindful that the early closing of Camps 1 and 2 will reduce Parchman's inmate capacity by 242 bed spaces, and realizes that the net increase of bed spaces, upon full utilization of the two new units completed by July 1, 1978, after subtracting the loss incident to closing of Camps 1 and 2 will be 122 beds. The court is equally mindful of the consequences of continuing backlog of felony offenders in county jails throughout the state, a factor of public concern but necessarily subordinate to constitutional imperatives. We cannot withhold the closing of Camps 1 and 2 until replacement facilities can be provided.[13] The time for that desirable

---

13. The court was informed, on its Parchman tour, by the Director of the Mississippi Building Commission, a body composed of the Governor, Lt. Governor, and state legislators, is cur-

rently charged with the responsibility for expenditures of $120,000,000 constructing and renovating state buildings, of which the Parchman buildings are but a small part. The court

changeover has been lost. As stated by the Fifth Circuit in *Newman v. State of Alabama,* 503 F.2d 1320, 1333 (1974), "it is axiomatic that the remedial power of a district court is coterminous with the scope of the constitutional violation found to exist . . . Consequently, no litany of the prison [hopes and expectations for new housing units] can vitiate the district court's duty to fashion a remedy commensurate in scope with that of the infirmities discerned."

Considering our constitutional duty and the equities of the present housing conditions at Parchman, we conclude that Camps 1 and 2 should be closed not later than November 1, 1978. The limited time of five months to close both camps as housing units allows prison officials ample time to study alternatives, make the necessary adjustments in utilization of other prison housing facilities without subjecting inmates confined in Camps 1 and 2 longer than this court believes to be absolutely necessary to meet essential needs of the state penitentiary. A closing order consistent with the views herein expressed will be issued forthwith.

was further informed that the Commission has acted with minimal staff of 19 persons to carry the responsibility for constructing, renovating and maintaining state-owned buildings having a value in excess of three billion dollars. Though it is highly encouraging that the State Legislature appropriated substantial sums of money for construction of critically needed units at the penitentiary, the time for converting appropriated funds into buildings seems, nevertheless, dependent upon a myriad of factors which we do not find appropriate to assess responsibility for delay other than to state that if lack of funds by a state is not a defense to maintaining an unconstitutional prison, delays in state agencies, architects, engineers, contractors, whether due to lack of preplanning, absence of any sense of emergency or lack of technical staff, surely cannot thwart constitutional demands.